UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| HARLEY-DAVIDSON MOTOR COMPANY, INC. AND H-D MICHIGAN, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. _____ |
| ST. PAUL MOTORSPORTS, INC. D/B/A ST. PAUL HARLEY-DAVIDSON, | ) ) ) | |
| Defendant. | ) ) | |

## **COMPLAINT**

Plaintiff Harley-Davidson Motor Company, Inc. ("HDMC") and H-D Michigan, LLC ("HDM"), collectively "Harley-Davidson," for their Complaint against Defendant St. Paul Motorsports, Inc. d/b/a St. Paul Harley-Davidson ("St. Paul") respectfully state as follows:

### **Nature of Action**

1.      This is a civil action for a declaratory judgment arising out of a dispute over HDMC's announcement concerning two policies:  (a) its Non-Retail Sales Policy for Genuine Motor Parts, Genuine Motor Accessories, and MotorClothes® (PAM) Products, which includes a prohibition on sales to customers located outside the United States, and (b) its Third Party Internet Sales Policy for Genuine Motor Parts, Genuine Motor Accessories, and MotorClothes® (PAM) Products, which prohibits sales of PAM products through third party websites.  True and correct copies of the policies are attached as Exhibits 1 and 2, respectively (collectively, "the Policies").

2.      "PAM" refers to Harley-Davidson motorcycle parts, accessories and MotorClothes® products, collectively, as sold by Harley-Davidson to its authorized dealers.

MotorClothes® and the MotorClothes logo are registered trademarks of Harley-Davidson and are used in connection with a wide range of general merchandise, including apparel, accessories, gifts and collectibles (including glassware, key chains, photo frames, coolers, clocks, bags and luggage, bottle openers, signs, desk accessories, gift wrap, banks, belts and buckles, helmets, hats and caps, wallets, gloves, goggles, lanyards, rainwear and jewelry.

3. Specifically, the Policies clarify that, as has long been the case with the sale of Harley-Davidson® motorcycles, Harley-Davidson dealers may not sell PAM products to customers located outside the United States (excepting members of the U.S. Armed Services located overseas) and may not sell PAM products via third-party websites, such as eBay, Amazon and the like.

4. The Policies, in addition to ensuring consistency with the rules concerning sales of Harley-Davidson® motorcycles, address HDMC's concerns that such sales (a) dilute its dealers' required, primary focus on sales of motorcycles to customers located in their local geographic territories, (b) are detrimental to Harley-Davidson's brand reputation and marks and the unique customer experience that is a hallmark of Harley-Davidson, (c) put international Harley-Davidson dealers at a competitive disadvantage in their own territories, and (d) may cause potentially unsafe and unlawful conditions in foreign countries into which products are sold by U.S. dealers.

**Parties**

5. HDMC is a Wisconsin corporation with its principal place of business at 3700 West Juneau Avenue, Milwaukee, Wisconsin. HDMC is a citizen of Wisconsin. HDMC markets Harley-Davidson branded motorcycles, motorcycle parts, motorcycle accessories, and general merchandise, including clothing and related products, through a network of authorized dealers who operate in designated local territories pursuant to dealer contracts.

2

4825-8902-3245.1

6. HDM, an affiliate of HDMC, is a Michigan limited liability company that is wholly owned by Harley-Davidson, Inc., a Delaware corporation with its principal place of business in Milwaukee, Wisconsin. HDM is the exclusive owner, and HDMC is HDM's licensee, of various Harley-Davidson trademarks which HDMC uses in connection with the distribution and sale of various Harley-Davidson® brand products. HDMC sublicenses the trademarks for use in connection with dealership products and services, to its authorized dealers as part of its dealer contracts for use in connection with dealership products and services.

7. Upon information and belief, St. Paul is a Minnesota corporation based in St. Paul, Minnesota. St. Paul is engaged in the business of selling Harley-Davidson® brand motorcycles and products to retail consumers pursuant to the terms of the Motorcycle Dealer Contract between HDMC and St. Paul and the General Terms and Conditions incorporated into the Motorcycle Dealer Contract, true and correct copies of which are attached as Exhibit 3 (collectively "the Dealer Contract").

**Jurisdiction and Venue**

8. This Court has jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

10. Harley-Davidson seeks a declaration that the Policies are valid and enforceable because:

A. Wis. Stat. ch. 218 and Minn. ch. 80E ("the dealer statutes") do not apply to Harley-Davidson's enforcement of the Policies because those statutes relate only to the sale of motor vehicles and motorcycles or the sale of parts at a dealer's licensed location, and thus do not apply to the sale of PAM on the internet and internationally. At a minimum, the statutes do not relate to the sale of MotorClothes® products.

3

B.   In the alternative, if the dealer statutes are construed to apply to Harley-Davidson's enforcement of the Policies, they are preempted by federal law because (1) the Policies deal directly with Harley-Davidson's right and duty to protect and enhance its trademarks and brand reputation as protected by the Lanham Act; and (2) the statutes are preempted by the Commerce Clause because the Policies directly impact interstate commerce.

C.   Or, if the Court finds the dealer statutes apply, and no federal preemption issues exist, Harley-Davidson can nonetheless enforce the Policies because (1) the Policies are not a modification of the Dealer Contract under Wis. Stat. § 218.0116(8)(a) or Minn. Stat. § 80E.13(k) because the Dealer Contract specifically allows Harley-Davidson to enact such policies and the Policies were designed to preserve the Dealer Contract's stated goals and intent; or (2) if the Policies are a change in the Dealer Contract, good cause exists for the change.

## FACTS

11.     Harley-Davidson, in combination with its affiliates, is an internationally recognized designer, engineer, manufacturer, distributor, and supplier of motorcycles, motorcycle parts, motorcycle accessories, and general merchandise, including clothing. Beginning in 1903, Harley-Davidson has manufactured, advertised, and sold motorcycles and related products and services.

12.     Harley-Davidson's product offering has grown to encompass a wide variety of products and services, including motorcycle parts and accessories, clothing, footwear, jewelry, fashion accessories, and glassware. Since their first use a century ago, Harley-Davidson has used both the word mark HARLEY-DAVIDSON and its famous Bar & Shield logo (the "Bar & Shield Logo") in connection with all of the products and services described above, in various iterations including those depicted below:

4



  

 

13.     Harley-Davidson owns the exclusive rights to use the HARLEY-DAVIDSON mark and Bar & Shield Logo, including but not limited to the marks shown above, both with and without wording, for motorcycles and a wide range of other products and services, including clothing, footwear, jewelry, fashion accessories, glassware, key chains, and the like.

14.     Harley-Davidson has sold billions of dollars worth of products and services under the HARLEY-DAVIDSON mark and Bar & Shield Logo and has expended a great deal of time and effort and hundreds of millions of dollars in the promotion and advertisement of its products and services sold and offered for sale under these marks.

15.     As a result of Harley-Davidson's long and continuous use of HARLEY-DAVIDSON and the Bar & Shield Logo in connection with its goods and services, and as a consequence of Harley-Davidson's advertising, promotion, and sale of goods and services under these marks, the consuming public, and members in the motorcycle industry, have come to recognize both HARLEY-DAVIDSON and the Bar & Shield Logo as identifying Harley-

5

Davidson when used in connection with a wide variety of goods and services. Harley-Davidson

derives substantial goodwill and value from this recognition, association, and identification by

the consuming public and the industry.

16.     The strength and instant recognition of Harley-Davidson's trademarks are

an integral component of Harley-Davidson's brand and success.

17.     While Harley-Davidson has gained common law trademark rights through

its use, advertising and promotion of its marks, Harley-Davidson has also sought to protect its

valuable trademarks by filing for and obtaining numerous federal trademark and service mark

registrations for HARLEY-DAVIDSON and the Bar & Shield Logo covering a wide variety of

products and services, including the following:

| Mark | Registration Number and Date of Issuance | Summary of Goods and Services |
|------|------------------------------------------|-------------------------------|
|  | 1,511,060*; 11/1/88; | Clothing, namely, boots, sweat shirts, jeans, hats, caps, scarves, motorcycle riding suits, neck ties, shirts, T-shirts, jackets, vest, ladies tops, bandanas and sox |
|  | 1,741,456*; 12/22/92 | Embroidered patches and belt buckles not of precious metals |
|  | 1,711,882*; 9/1/92 | Embroidered patches for clothing |

6

| | | |
|---|---|---|
|  | 1,263,936*; 1/17/84 | Wide variety of items, including ash trays, clothing, towels, mugs, decorative plaques, jewelry, posters, motorcycle accessories, wallets, sunglasses, and lamps |
|  | 1,660,539*; 10/14/91 | Wide variety of goods, including motorcycles, knives, sunglasses, books, and clothing |
|  | 2,376,674*; 8/15/00 | Wide variety of goods including metal locks, leather gloves, sunglasses, motorcycle parts, and leather travel bags |
|  | 3,756,505; 3/09/2010 | Wide variety of financial services, including, but not limited to, insurance services relating to motorcycles, namely insurance agency, insurance consultancy, providing insurance information and insurance brokerage, underwriting, funding, servicing and collection of consumer and commercial loans, provision of finance, provision of financial information, financial valuations, and other financial services |
|  | 2,660,205*; 12/10/02 | Education and entertainment services |

7

4825-8902-3245.1

| | | |
|---|---|---|
|  | 1,913,992*; 8/22/95 | Restaurant and bar services. |
|  | 1,311,460*; 12/25/84 | Repair and servicing of motorcycles and retail store services in the field of motorcycles |
| HARLEY-DAVIDSON | 1,255,091*; 10/25/83 | Wide variety of motorcycle parts & accessories |
| HARLEY-DAVIDSON | 3,490,890; 08/26/08 | HOUSE MARK for a line of motorcycles, structural parts for motorcycles and related motorcycle accessories, |
| HARLEY-DAVIDSON | 3,393,840; 03/11/08 | HOUSE MARK for a full line of clothing, footwear and headwear; |
| HARLEY-DAVIDSON | 1,311,457*; 12/25/84 | Repair and servicing of motorcycles; Retail store services in the field of motorcycles |
| HARLEY-DAVIDSON | 1,716,993; 09/15/92 | Entertainment services in the nature of motorcycle rallies; Restaurants and bar services; |
| HARLEY-DAVIDSON | 03/09/2010/3,756,506 | Wide variety of financial services including insurance and financing of motorcycles and credit card services |
| HARLEY-DAVIDSON | 3,490,890; 08/26/08 | HOUSE MARK for a line of motorcycles, structural parts for motorcycles and related motorcycle accessories, |
| HARLEY-DAVIDSON | 3,393,840; 03/11/08 | HOUSE MARK for a full line of clothing, footwear and headwear; |

18.    The foregoing trademark registrations are valid and subsisting.  They

constitute prima facie evidence of Harley-Davidson's exclusive right to use them in connection

4825-8902-3245.1

with the products and services recited in the registrations. Those registrations designated with asterisks above have been made incontestable in accordance with Section 15 of the Lanham Act, 15 U.S.C. § 1065.

19.     HARLEY-DAVIDSON and the Bar & Shield Logo (collectively the Harley-Davidson marks) have long become famous by virtue of their inherent strength and distinctiveness as applied to Harley-Davidson's products and services; their extensive nationwide use and promotion; the substantial commercial success enjoyed by Harley-Davidson using the marks; and the federal registrations of the marks on the Principal Register.

### HDMC's Dealer Structure

20.     To protect, enhance, and prevent dilution of the Harley-Davidson marks and its brand reputation, HDMC markets its motorcycles and related products through a network of dealers whose first priority, as stated expressly in the Dealer Contract, is "ensuring HDMC products are sold and serviced in a manner that promotes the Harley-Davidson brand experience while increasing customer confidence and customer satisfaction." (*See* Dealer Contract, General Conditions, Section A)

21.     HDMC's dealer relationships are designed to provide local, territory-based, retail sales to enhance the customer experience and create a personal relationship between Harley-Davidson customers and their local dealers, all of which is designed to promote, enhance and protect Harley-Davidson's brand, goodwill, and reputation. This purpose is reinforced throughout the Dealer Contract, including, for example:

A.     Dealer Contract, General Conditions, Section B: "Dealer shall devote its best efforts to promote aggressively the sale at retail of Harley-Davidson Products *to customers within the Territory* assigned to each Dealer by Seller." (Emphasis added)

B.     Dealer Contract, General Conditions, Section B(6): "Dealer shall not sell Harley-Davidson Products for resale to non-retail customers, except to other United States authorized Harley-Davidson dealers in accordance with Seller's written policies. Dealer shall not sell new Harley-Davidson Motorcycles through any Internet web site or

9

otherwise in e-commerce. *Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract and Dealer shall comply with all such policies and position statements.*" (Emphasis added)

C.    Dealer Contract, General Conditions, Section H: "A goal of Seller and Dealer is for the Harley-Davidson brand name to be synonymous with the highest levels of customer satisfaction in the motorcycle industry. ... Dealer agrees that satisfaction must occur before, at the time of, and after each sale or service to a customer, by ... involvement with Seller's Harley Owner's Group ("H.O.G.") program, other motorcycle organizations, community and such activities, *and by other ways of providing personal attention from the Dealer's retail facility.* Dealer will not engage in any practice or method of operation if its nature or quality may impair the reputation of Seller, the Harley-Davidson name or Harley-Davidson Products. ...." (Emphasis added)

D.    Dealer contract, General Conditions, Section K(3): "Dealer shall not engage in any conduct or take part in any activity which, with reference to the Trademarks ... might dilute the distinctive quality of the Trademarks or which might tend to disparage the Trademarks or Seller or HDM ...."

22.    Harley-Davidson implemented this territory-based dealer approach in order to achieve its goal of providing an extraordinary customer experience and the highest level of customer satisfaction to every Harley-Davidson customer.  Harley-Davidson's distribution strategy is designed to ensure that its dealers sell Harley-Davidson® products primarily to customers residing in each dealer's assigned territory, and only from approved locations under approved trade names.  This enhances and protects the goodwill associated with Harley-Davidson's trademarks, trade names, trade dress, and brand image, which have acquired distinctiveness and significant value in the mind of the public.

23.    Per the Dealer Contract and General Conditions, a dealer has no contractual-right to any profits except for profits from sales within its territory.  Likewise, the dealer is not contractually entitled to any sales outside of its dealer territory.

### Prohibition of Sales on Third Party Websites

24.    In recent years, Harley-Davidson became aware that certain dealers were increasingly making use of third party websites, such as Amazon.com, ebay.com, and

ShopNBC.com, to sell PAM products. Sellers on these third party websites frequently either misuse the Harley-Davidson marks (e.g. by identifying an article of clothing as a Harley jacket, when it is not) or sell counterfeit or infringing goods using the marks. While Harley-Davidson works diligently to protect its brand, the enormous growth of these venues created a concern that sale of genuine Harley-Davidson branded goods by dealers side-by-side with counterfeit, infringing or otherwise unauthorized goods, would create even more confusion among consumers as to the authenticity of Harley-Davidson goods.

      25.    In addition, Harley-Davidson spends significant resources to ensure that its dealerships, its web presence and its marketing generally all work together to deliver the unique brand and customer experience associated with the marks. The sale of its products on third-party websites is, at best, unhelpful in developing and enhancing that image and experience and, in many cases, is detrimental to it. For example, customer unhappiness with a purchasing experience or with the actual product purchased from a third party site negatively affects Harley-Davidson's goodwill. Even an authorized dealer selling genuine Harley-Davidson product on a third-party site could engender negative customer experience if the third party site's service standards (e.g. timeliness in shipping, accuracy in billing or handling returns) do not meet Harley-Davidson's service standards.

      26.    As a result, HDMC became increasingly concerned that customer confusion, dilution of its trademarks and damage to the value and goodwill associated with its brand reputation and marks would result if its products continued to be sold by dealers on these third party sites.

      27.    These third party websites sell across state lines as well as to international customers and, therefore, affect interstate commerce.

4825-8902-3245.1

28.     Harley-Davidson spends significant resources to enhance the Harley-Davidson marks and the goodwill associated with them for the benefit of Harley-Davidson's entire dealer network. Similarly, it has a right and a duty to police and protect its marks from practices that may harm, diminish, dilute or cause confusion. In furtherance of those purposes, HDMC adopted the Third Party Internet Sales Policy effective January 1, 2012 that places reasonable restrictions on the sale of Harley-Davidson® products through third party Internet websites.

29.     Harley-Davidson believes that the Third Party Internet Sales policy is reasonably necessary to prevent customer confusion and enhance and protect its marks, brand reputation, and goodwill.

30.     The Third Party Internet Sales Policy affects only the sale of PAM products. It does not affect the sale of motorcycles, but rather makes the restrictions on the sale of PAM products more consistent with longstanding restrictions on the sale of motorcycles.

31.     The Third Party Internet Sales policy applies to all Harley-Davidson® dealers in the U.S.

### *Prohibition on International Sales*

32.     Harley-Davidson does not make its entire product offering available to dealers in the United States, nor its entire offering available to dealers in other countries. Harley-Davidson® products intended for sale in the United States are not necessarily designed to work properly in foreign markets or meet all legal requirements of foreign markets. For example, Harley-Davidson manufactures heated riding gear that heats via connection to the electrical system of the rider's motorcycle. Because electrical voltage/current standards vary around the world, gear manufactured for use in the United States may not work properly, or at all, elsewhere.

12

33. Additionally, some parts and accessories may not be street legal in all jurisdictions around the world. For example, side-mounted license plate holders are prohibited in some parts of the world. Additionally, certain graphics or designs on Harley-Davidson® clothing and accessories designed for sale in the United States could potentially violate the laws or customs of other nations.

34. HDMC has established an extensive international dealer network to properly serve customers outside of the United States. Like Harley-Davidson's U.S. dealers, Harley-Davidson's international dealers are required to establish a retail sales location and make significant capital investments in order to adequately serve customers located within their geographic territories. Harley-Davidson's international dealers are permitted to purchase only products approved for sale in their individual jurisdictions and are not permitted to purchase products intended for sale only in the United States.

35. Over the past several years, HDMC has become concerned about its U.S. dealers selling PAM products to customers located outside of the United States as this practice (a) distracts Harley-Davidson's U.S. dealers from their primary, local focus required in the Dealer Contract, (b) unfairly places Harley-Davidson's international dealers at a competitive disadvantage in their own territories where they are not allowed to purchase the products sold by the U.S. dealers, and (c) creates the risk of unlawful or unsafe use of Harley-Davidson® products in other countries.

36. In January 2011, HDMC issued notice to its dealers of the "Non-Retail Sales Policy for its Genuine Motor Parts, Genuine Motor Accessories, and MotorClothes® (PAM) Products." That policy, effective August 1, 2011, clarified that the definition of prohibited Non-Retail sales includes any products sold and shipped to any customer located

13

outside the United States, with the exception of military customers temporarily stationed overseas.

37. HDMC implemented this clarification to the Non-Retail Sales Policy in order to make the restrictions on the sale of PAM products consistent with longstanding restrictions on the sale of motorcycles, to ensure customer satisfaction with the Harley-Davidson® products, to protect and enhance Harley-Davidson's brand image, marks, brand reputation, and goodwill, to ensure the safety of its international customers and compliance with the laws, customs and regulations of the nations outside the United States where its products are sold, and to ensure the economic health of its international dealer network.

38. The Non-Retail Sales Policy applies to all U.S. Harley-Davidson® dealers.

39. The Non-Retail Sales Policy affects only the sale of PAM products. It does not apply to motorcycles. Rather, it ensures that policies governing the sale of PAM products are consistent with HDMC's longstanding policies governing the sales of motorcycles.

### St. Paul's Administrative Complaint

40. St. Paul is one of the U.S. Harley-Davidson dealers that sells Harley-Davidson® merchandise internationally and through third party websites.

41. In response to the announcement of the effective dates of the Policies prohibiting the sale of Harley-Davidson® merchandise on third party websites and overseas, St. Paul filed a Complaint before the State of Wisconsin Division of Hearings and Appeals seeking both a determination that the Policies were improper and an injunction enjoining the implementation of the Policies.

4825-8902-3245.1

42.     St. Paul's Complaint requested a declaration that there was no good cause under Wis. Stat. § 218.0116(8) for the implementation of the Policies and an injunction permanently enjoining HDMC from implementing the new policies.

43.     The Division of Hearings and Appeals lacks subject matter jurisdiction to adjudicate St. Paul's claims because St. Paul does not hold, and is not eligible to hold, a Wisconsin motor vehicle dealer license. A proposed decision dismissing St. Paul's claims has been issued by the Division of Hearings and Appeals and a final decision is pending. Comments objecting to or in support of the proposed decision are due November 7, 2011. Pending a final decision, however, Harley-Davidson is precluded from enforcing its policies against St. Paul by Wis. Stat. § 218.0116(8)(a).

### *Wisconsin Motor Vehicle Dealer Law, Wis. Stat. § 218.0101, et seq.*

44.     Wis. Stat. § 218.0116 provides that:

(8)(a) A manufacturer or distributor may not modify a motor vehicle dealer agreement during the term of the agreement or upon its renewal if the modification substantially and adversely affects the motor vehicle dealer's rights, obligations, investment or return on investment without giving 60 days written notice of the proposed modification to the motor vehicle dealer unless the modification is required by law, court order or the licensor. Within the 60-day notice period the motor vehicle dealer may file with the department of transportation and the division of hearings and appeals and serve upon the respondent a complaint for a determination of whether there is good cause for permitting the proposed modification. The division of hearings and appeals shall promptly schedule a hearing and decide the matter. Multiple complaints pertaining to the same proposed modification shall be consolidated for hearing. The proposed modification may not take effect pending the determination of the matter

(b) In making a determination of whether there is good cause for permitting a proposed modification, the burden of proof shall be on the manufacturer or distributor, except that the burden of proof with regard to the factor set forth in para. (b) 3, shall be on the dealer, and the division of hearings and appeals may consider any relevant factor including:

1.  The reasons for the proposed modification.

2.  Whether the proposed modification is applied to or affects all motor vehicle dealers in a nondiscriminating manner.

3.  The degree to which the proposed modification will have a substantial and adverse effect upon the motor vehicle dealer's rights, investment, or return on investment

4.  Whether the proposed modification is in the public interest.

5.  The degree to which the proposed modification is necessary to the orderly and profitable distribution of products by the respondent.

6.  Whether the proposed modification is offset by other modifications beneficial to the motor vehicle dealer.

45.    Wis. Stat. § 218.0101(23)(a) defines a "Motor vehicle dealer" as a person, firm or corporation who:

1.  For commission, money or other thing of value, sells, leases, exchanges, buys, offers or attempts to negotiate a sale, consumer lease or exchange of an interest in motor vehicles; or

2.  Is engaged wholly or in part in the business of selling or leasing motor vehicles, including motorcycles, whether or not the motor vehicles are owned by that person, firm or corporation.

46.    Wis. Stat. § 218.0116(8)(a) regulates modifications to ***motor vehicle dealer*** agreements, meaning it applies to agreements concerning the sale of motor vehicles or motorcycles.

47.    Wis. Stat. ch. 218 is not intended to apply extraterritorially or to interstate commerce and, therefore, does not apply to motor vehicles dealers who are not licensed in Wisconsin.  Accordingly, Wis. Stat ch. 218 does not apply to the Policies, because the Policies regulate the sale of PAM products outside of Wisconsin, and do not affect in-store sales or the sale of motorcycles or motor vehicles.

16

48.     If applied to the Policies, Wis. Stat. ch. 218 is preempted by (a) the Lanham Act (15 U.S.C. §§ 1051, *et seq.*) because the Policies directly relate to Harley-Davidson's right and duty to police and protect its federally registered trademarks and brand reputation; and (b) the Commerce Clause (U.S. Const. art. I, § 8, cl. 3) because applying the statute to the Policies would have an adverse and chilling effect on the conduct of Harley-Davidson's business outside of Wisconsin.

49.     If Wis. Stat. ch. 218 does apply to the Policies, the Policies are valid and enforceable because the Policies are not a modification to the Dealer Contract under § 218.0116(8)(a) but rather are expressly provided for by the terms of the Dealer Contract as set forth in paragraph 21 above.

50.     Additionally, if the Policies are a modification under § 218.0116(8)(a), good cause exists for the modification under § 218.0116(8)(b) because:

A.     The Policies are reasonably necessary to enhance and protect Harley-Davidson's marks, brand reputation, and goodwill.

B.     The Policies will be applied to all U.S. Harley-Davidson® dealers in a nondiscriminatory manner.

C.     The Policies will not adversely affect St. Paul's contractual rights as St. Paul is not contractually entitled to sell PAM products on the internet via third party websites or to customers located outside of the United States. St. Paul's dealer assigned territory per the terms of the Dealer Contract is limited to portions of Minnesota and, to a limited extent, Wisconsin.

D.     The Policies are in the public interest as, among other things, they are designed to enhance customer confidence and goodwill in the brand, ensure that the laws of foreign jurisdictions are not violated, and prevent potential safety problems.

E.     The Policies are necessary to allow HDMC to uniformly manage its dealerships across all 50 states in a way that is orderly and linked to profitable distribution for all of its dealers.

17

*Minnesota Motor Vehicle Sale and Distribution Statute*

51.　Because St. Paul is located in Minnesota, Harley-Davidson also seeks a declaration that the Minnesota Motor Vehicle Sale and Distribution law, Minn. Stat. ch. 80E, does not apply to the Policies.

52.　Minn. Stat. § 80E.01 states the Legislative Purpose and Intent of the Motor Vehicle Sale and Distribution law as follows:

> The legislature finds and declares that ***the distribution and sale of motor vehicles within this state*** vitally affects the general economy of the state and the public interest and the public welfare, and that in order to promote the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate and license motor vehicle manufacturers, distributors or wholesalers, and factory or distributor representatives, and to regulate dealers of motor vehicles doing business in this state in order to prevent fraud, impositions, and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state. (Emphasis added)

Thus, the Minnesota Motor Vehicle law is specifically intended to regulate the distribution and sale of motor vehicles within Minnesota.

53.　Minn. Stat § 80E.13(k) regulates modifications to Motor Vehicle Contracts. It states that it is an unlawful and unfair practice for a manufacturer, distributor or factory branch to "threaten to modify or replace or modify or replace a franchise with a succeeding franchise that would adversely alter the rights or obligations of a new motor vehicle dealer under an existing franchise or that substantially impairs the sales or service obligations or investments of the motor vehicle dealer."

54.　Minn. Stat. § 80E.03(8) defines a "Franchise" as "the written agreement or contract between any new motor vehicle manufacturer and any new motor vehicle dealer which grants to the dealer the right to market motor vehicles and which purports to fix the legal rights and liabilities of the parties to the agreement or contract."

18

55.     Minn. Stat. ch. 80E does not apply to the regulation of the sale of PAM products.

56.     Minn. Stat. ch. 80E is not intended to apply extraterritorially or to interstate commerce per the stated legislative intent of the statute.

57.     Minn. Stat. ch. 80E does not apply to the Policies because the Policies regulate the extraterritorial sale of PAM products, and do not affect in-store sales or the sale of motorcycles.

58.     Moreover, Minn. Stat. § 80E.13(k) only deals with modifications to Franchises, which are statutorily defined only as the rights to market motor vehicles.

59.     The application of Minn. Stat. ch. 80E to the Policies is also preempted by both the Lanham Act and the Commerce Clause for the same reasons that the application of the Wisconsin statute is preempted.

60.     If Minn. Stat. ch. 80E does apply to the Policies, the Policies are valid and enforceable because the Policies are not modifications of the Dealer Contract per Minn. Stat. 80E.13(k) but rather are expressly provided for in the terms of the Dealer Contract, including those sections described in paragraph 21 above.

## Count 1:  Declaratory Judgment

61.     Harley-Davidson re-alleges Paragraphs 1-60 of this Complaint.

62.     An actual controversy exists between HDMC and St. Paul over whether HDMC's Policies are valid and enforceable.

63.     The controversy affects the contractual relationship between HDMC and St. Paul.

64.     HDMC and St. Paul have adverse interests, as HDMC believes the Policies are reasonably necessary to enhance and protect its marks, brand reputation, and

19

goodwill and to ensure the continued success of its entire dealer network, while St. Paul wants permanently to enjoin HDMC from enforcing the Policies against it. As a practical matter, preventing HDMC from enforcing the Policies with respect to St. Paul will make it difficult, if not impossible, to enforce the Policies against any other Harley-Davidson dealer.

65.    As such, Harley-Davidson is entitled to a declaration that its Policies are valid and enforceable in order to end the conflict between HDMC and St. Paul.

## PRAYER FOR RELIEF

**WHEREFORE,** Harley-Davidson prays for a declaratory judgment that HDMC's Policies prohibiting U.S. dealer sales of PAM products internationally and on third party websites, are valid and enforceable because:

A.    Wis. Stat. ch. 218 and Minn. Stat. ch. 80E do not apply to Harley-Davidson's enforcement of the Policies because those statutes relate only to the sale of motor vehicles and motorcycles or the sale of parts at the dealer's licensed location, and thus do not apply to the sale of PAM on the internet and internationally or, at a minimum, the statutes do not relate to the sale of MotorClothes® products.

B.    In the alternative, if the dealer statutes are construed as applying to Harley-Davidson's enforcement of the Policies, they are preempted by federal law because (1) the Policies are integral to Harley-Davidson's right and duty to police and protect its trademark and brand reputation as protected by the Lanham Act; and (2) application of the statutes to the Policies would have an adverse and chilling effect on the conduct of Harley-Davidson's business outside of Wisconsin and Minnesota, respectively.

C.    If the Court finds the dealer statutes apply, and they are not preempted, HDMC can nonetheless enforce the Policies because (1) the Policies are not a modification of the Dealer Contract under Wis. Stat. § 218.0116(8)(a) or Minn. Stat. § 80E.13(k) because the Dealer Contract specifically allows HDMC to enact such policies and the Policies were designed to preserve the Dealer Contract's stated goals and intent; or (2) if the Policies are a change in the Dealer Contract, good cause exists for the change.

20

Dated: October 27, 2011

Respectfully submitted,

/s Roberta F. Howell
Roberta F. Howell, WI Bar No. 1000275
Jodi L. Newman, WI Bar No. 1083773
FOLEY & LARDNER LLP
150 East Gilman Street
Post Office Box 1497
Madison, WI 53701-1497
608.257.5035 (phone)
608.258.4258 (facsimile)
rhowell@foley.com
jknewman@foley.com

Adam E. Crawford, WI Bar No. 1056803
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53201
414.271.2400 (phone)
414.297.4900 (facsimile)
aecrawford@foley.com

*Attorneys for Harley-Davidson Motor Co., Inc.
and H-D Michigan, LLC*

21