# EXHIBIT 3

# 2010 ADDENDUM
# TO THE
# HARLEY-DAVIDSON MOTORCYCLE DEALER CONTRACT

WHEREAS, Harley-Davidson Motor Company, Inc., d/b/a Harley-Davidson Motor Company ("Seller") and **St. Paul Motorsports, Inc.**, d/b/a **St. Paul Harley-Davidson** ("Dealer") are parties to a Harley-Davidson Motorcycle Dealer Contract ("Dealer Contract");

WHEREAS, Seller and Dealer desire to extend the term of, and make other minor and stylistic changes to, the Dealer Contract;

Now, therefore, in consideration of the mutual agreements made in this Addendum, the parties agree as follows:

1.     Section 8 of the Dealer Contract is amended to state:

This Contract shall expire on <u>December 31, 2014,</u> unless sooner terminated as provided in the General Conditions.

2.     Section 3 of the Dealer Contract is amended to state:

This Contract shall bind Seller only when it bears the manual signature (or a facsimile) of one of Seller's Vice Presidents or Directors and a duplicate original thereof is delivered personally or by mail to Dealer or to Dealer's place of business.

3.     The date in line 2 of Section 6 of the Dealer Contract is changed from August 1, 2009 to August 1, 2014. The proviso in lines 9-13 of paragraph 6 is amended to state: "provided that Dealer meets or exceeds the special market rights performance criteria established in good faith by Seller from time-to-time hereunder (referred to in this Contract as the "Special Market Rights Performance Criteria"), in consultation with Seller's National Dealer Advisory Council;"

4.     The reference in the first line of Section K.1 of the General Conditions to "H-D Michigan, Inc., a Michigan corporation," is changed to "H-D Michigan, LLC, a Michigan limited liability company".

5.     The reference in the last line of Section P.8 of the General Conditions to a "Vice President or a Director of Field Sales or Operations of Seller," is changed to a "Vice President or Director of Seller".

6.     If Seller and Dealer previously executed one or more Secondary Retail Location Addendum(s) to the Dealer Contract ("SRL Addendum"), Section 6 of each such SRL Addendum is amended to state:

Notwithstanding anything herein to the contrary and unless this Addendum is sooner terminated as provided herein, this Addendum, including Dealer's right to conduct operations from the SRL, shall expire automatically, without right of renewal and without prior notice, on <u>December 31, 2014.</u>

7.  If Seller and Dealer previously executed one or more Alternate Retail Outlet Addendum(s) to the Dealer Contract ("ARO Addendum"), Section 8 of each such ARO Addendum is amended to state:

> Notwithstanding anything herein to the contrary and unless this Addendum is sooner terminated as provided herein, this Addendum, including Dealer's right to conduct operations from the ARO Location, shall expire automatically, without right of renewal and without prior notice, on December 31, 2014.

8.  If any provision of this Addendum is held invalid and unenforceable for any reason whatsoever or is held to violate any law in any jurisdiction, such provision will be deemed deleted from this Addendum in such jurisdiction and the remainder of this Addendum will be valid and enforceable without such provision.

9.  This Addendum shall expire upon the earlier of termination of the Dealer Contract or December 31, 2014.

10. Except as expressly provided in this Addendum, this Addendum is subject to all of the terms and conditions of the Dealer Contract.

**DEALER:**

By: _____

Thomas L. Giannetti
President
Dealer Operator


Accepted by **SELLER** at Milwaukee, Wisconsin:

**HARLEY-DAVIDSON MOTOR COMPANY, INC.**
**D/B/A HARLEY-DAVIDSON MOTOR COMPANY**


By: _____

Greg Heichelbech
Director, Dealer Development


Executed on the 28 day of September 2009.

# HARLEY-DAVIDSON MOTOR COMPANY
## MOTORCYCLE DEALER CONTRACT

**CONTRACT**, made at Milwaukee, Wisconsin, between Harley-Davidson Motor Company, Inc.; d/b/a Harley-Davidson Motor Company, a Wisconsin corporation, of 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208 (referred to in this Contract as "Seller"), and

## <u>St. Paul Motorsports, Inc.</u>

a(n) **Minnesota** Corporation

d/b/a **St. Paul Harley-Davidson**        (referred to in this Contract as the "Dealer");

**41-1568156**

(if corporation, partnership, or LLC, Federal EIN)

with its place of business at:

**2899 Hudson Blvd.**
**St. Paul, MN 55128**

(described more fully in this Contract in paragraph 5 as the "Dealer Location").

In consideration of the mutual agreements hereinafter made in this Contract, the parties hereto agree as follows:

**1. GRANT OF RIGHTS**. Seller hereby grants to Dealer, and Dealer hereby accepts from Seller, the following rights:

A. To purchase and resell at retail, primarily to persons residing or doing business in the Territory to be assigned by Seller, the motorcycles, parts, accessories, clothing, and other items (collectively referred to in this Contract as the "Harley-Davidson Products") identified in the Products Addendum to the Harley-Davidson Motor Company Motorcycle Dealer Contract (referred to in this Contract as the "Products Addendum");

B. To identify itself as an authorized Harley-Davidson motorcycle dealer utilizing approved signage at the Dealer Location approved under this Contract; and

C. To use the name Harley-Davidson and certain other trademarks and service marks of Seller and Seller's affiliate which are licensed by Seller in the advertising, promotion, sale and servicing of Harley-Davidson Products in the manner provided in this Contract and from the Dealer Location.

Each of the foregoing rights granted to Dealer shall be non-exclusive.

**2. GENERAL CONDITIONS.** The Harley-Davidson Motor Company General Conditions of Sales and Service (January 2005) (referred to in this Contract as the "General Conditions"), a copy of which has been provided to Dealer and has been read and agreed to by Seller and Dealer, and such General Conditions and any duly executed and delivered supplement or amendment thereto are hereby expressly made a part of this Contract and incorporated herein. Unless the context otherwise requires, any term defined in any part of this Contract shall have the same meaning in all parts of this Contract.

**3. EXECUTION.** This Contract shall bind Seller only when it bears the manual signature (or a facsimile) of one of Seller's Vice Presidents, Director of Field Sales, or Directors of Field Operations and a duplicate original thereof is delivered personally or by mail to Dealer or to Dealer's place of business.

**4. MANAGEMENT AND OWNERSHIP.** This Contract has been entered into by Seller with Dealer in reliance upon Dealer's representation and agreement that:

A. The Dealer Operator and Owner(s) identified below possess and will maintain the personal qualifications, experience, skill and commitment necessary to ensure that Dealer will perform its obligations under this Contract in the most effective manner;

B. The Dealer Operator, and no other person(s), shall have the ultimate authority to direct and manage the operations of Dealer's authorized Harley-Davidson dealership, shall be responsible for the dealership's performance under this Contract and shall be personally involved in the day-to-day management and operations of the dealership on a full time basis; the Dealer Operator shall be **Thomas L. Giannetti**.

C. The following person(s), and only the following person(s), shall be the owner(s) of Dealer and Dealer's authorized Harley-Davidson dealership (referred to in this Contract as the "Owner(s)") and shall have ownership and control of Dealer in the percentage interests identified below (referred to in this Contract as the "Ownership"):

| Level | Legal Name | | Type | Entity Ownership % |
|---|---|---|---|---|
| 1 | St. Paul Motorsports, Inc. (Dealership) | | | |
| | 1A | Quadriga Motor Company, Inc. | Corporation | 100.00 |

| 1A | Quadriga Motor Company, Inc. | | | |
|---|---|---|---|---|
| | 1A1 | Thomas L. Giannetti (CEO, President, CFO & Treasurer) | Individual | 51.00 |
| | 1A2 | Melanie K. Giannetti (Vice President & Secretary) | Individual | 49.00 |

### Ownership and Control Summary

| St. Paul Motorsports, Inc. | Dealership Owner % | Dealership Control % |
|---|---|---|
| Thomas L. Giannetti (President & Treasurer) | 51.00 | 51.00 |
| Melanie K. Giannetti (Vice President & Secretary) | 49.00 | 49.00 |
| **Total** | **100.00** | **100.00** |

D. The Dealer Operator shall be an Owner approved by Seller. No changes, directly or indirectly, intentionally or otherwise, may be made from the Dealer Operator or Ownership approved in this Contract without first complying with the requirements of this Contract for such changes.

**5. APPROVED DEALER LOCATION.** In order that Seller may establish and maintain an effective network of authorized Harley-Davidson dealers, Dealer agrees that it shall conduct all of its operations under this Contract only in and from facilities and at the location designated in this Contract and approved in advance by Seller. Dealer and the Dealer Operator and Owner(s) approved under this Contract therefore shall not, either directly or indirectly, relocate to or establish any place of business for the temporary or permanent sale or service of new or used Harley-Davidson Products or the conduct of any other responsibilities under this Contract at any other location, without the express prior written consent of Seller. Seller has no obligation to approve any request from Dealer to establish or operate any alternate retail outlet or any secondary retail location. Seller hereby designates and approves only the following location for the sale and servicing of Harley-Davidson Products and the display of Harley-Davidson Trademarks:

**2899 Hudson Blvd.**
**St. Paul, MN 55128**

(referred to in this Contract as the "Dealer Location").

**6. SPECIAL MARKET RIGHTS.** Seller agrees it may not, during the period from the date of the execution of this Contract until August 1, 2009, authorize the establishment of any additional Harley-Davidson motorcycle dealerships (which does not include any pre-existing Harley-Davidson dealer points, the relocation of any existing Harley-Davidson dealership to a facility more than five miles from the Dealer Location, any alternate retail outlets or secondary retail locations located within any dealer's territory if approved by Seller, or any temporary facilities approved by Seller in connection with any motorcycle event or special event), for the sale and service of Harley-Davidson Products within a radius of ten (10) miles from the Dealer Location (referred to in this Contract as "Special Market Rights"); provided that Dealer, as of November 1, 2004, met or exceeded and continues, until August 1, 2009, to meet or exceed the special market rights performance criteria established in good faith by Seller from time-to-time hereunder (referred to in this Contract as the "Special Market Rights Performance Criteria"), in consultation with Seller's National Dealer Advisory Council; and provided further that Dealer is not in breach of any terms and conditions of this Contract. Prior to Dealer's execution of this Contract, Seller will notify Dealer in writing of the current Special Market Rights Performance Criteria established by Seller and inform Dealer whether Dealer meets or exceeds the current Special Market Rights Performance Criteria for purposes of this paragraph. Dealer's Special Market Rights only limit the location at which an additional Harley-Davidson motorcycle dealership may be established and are not in any way related to, and have no impact upon, Dealer's Territory, which remains non-exclusive and subject to change by Harley-Davidson from time-to-time.

**7. ADDITIONAL PROVISIONS.** In consideration of Seller's agreement to appoint Dealer as an authorized Harley-Davidson dealer, Dealer further agrees as follows:

NONE

**8. TERM.** This Contract shall expire on <u>December 31, 2009</u>, unless sooner terminated as provided in the General Conditions.

**IN WITNESS WHEREOF** the parties hereto have duly executed this Contract in duplicate as of the day and year written below.

DEALER:

**ST. PAUL MOTORSPORTS, INC.**

By: _____

Thomas L. Giannetti
President
Dealer Operator

Accepted by SELLER at Milwaukee, Wisconsin:

**HARLEY-DAVIDSON MOTOR COMPANY, INC.**
**D/B/A HARLEY-DAVIDSON MOTOR COMPANY**

By: _____

Michael W. Kennedy
Sr. Director, Field Operations & Strategy

Executed as of the __18__ day of __May__ , 2009.

# PRODUCTS ADDENDUM
## TO THE HARLEY-DAVIDSON MOTOR COMPANY
## MOTORCYCLE DEALER CONTRACT

For purposes of this Contract, the "Harley-Davidson Products" consist of only the following products:

(1) New FL, FX, XL, and VRSC chassis family twin cylinder heavyweight motorcycles, which are manufactured by Seller or its affiliates and distributed and offered for sale by Seller under the Harley-Davidson brand name ("Harley-Davidson Motorcycles");

(2) Those replacement parts, mechanical accessories, tools, lubricants, equipment and other motorcycle supplies which are offered for sale by Seller under the Genuine Motor Parts, Genuine Motor Accessories, or Screamin' Eagle brand names and which are contained in Seller's then current authorized dealer parts and accessories catalogs and authorized parts manuals, including supplements thereto, published from time to time by Seller ("Parts and Accessories"); and

(3) The clothing, footwear, clothing accessories, rider accessories, personal items, household items, toys, collectibles, and miscellaneous novelty items, other than licensed products, which are offered for sale by Seller to authorized Harley-Davidson dealers under the Harley-Davidson brand name and which are included by Seller in the then current Harley-Davidson MotorClothes and collectibles catalog(s) for authorized dealers, including supplements thereto, published from time to time by Seller.

As stated in paragraph 1 of the Dealer Contract, the right to purchase and resell each of these Harley-Davidson Products is not exclusive to the authorized Harley-Davidson dealer network.

# HARLEY-DAVIDSON

# MOTOR COMPANY

## GENERAL CONDITIONS OF SALES AND SERVICE

(January 2005)

# TABLE OF CONTENTS

A. PURPOSES AND OBJECTIVES OF THIS CONTRACT......................................................... 1

B. SALES EFFORTS ..........................................................................................................1

    1. MOTORCYCLE SALES ...........................................................................................1
    2. MOTORCYCLE INVENTORY AND DEMONSTRATORS ..........................................2
    3. PARTS AND ACCESSORIES AND MOTORCLOTHES PRODUCT SALES .................2
    4. PARTS AND ACCESSORIES AND MOTORCLOTHES PRODUCT INVENTORIES .........2
    5. POLICE SALES .....................................................................................................2
    6. NON-RETAIL SALES .............................................................................................2

C. ORDERS AND TERMS OF SALE .....................................................................................3

    1. INITIAL MOTORCYCLE ORDER ...........................................................................3
    2. BASIC MOTORCYCLE ORDER ...............................................................................3
    3. SPECIAL EQUIPMENT .........................................................................................3
    4. DELIVERY AND TITLE ..........................................................................................4
    5. DESTINATION CHARGES AND DIVERSION ...........................................................4
    6. FAILURE TO DELIVER ..........................................................................................4

D. PRICES AND PAYMENT ................................................................................................4

    1. PRICES.................................................................................................................4
    2. PAYMENT ...........................................................................................................5
    3. DELINQUENCY ...................................................................................................5

E. FACILITIES....................................................................................................................5

    1. LOCATION AND USE ...........................................................................................5
    2. IDENTIFICATION ................................................................................................5
    3. HOURS OF OPERATION .......................................................................................5
    4. SELLER ASSISTANCE ...........................................................................................5

F. SERVICE .......................................................................................................................6

    1. SERVICE ORGANIZATION ....................................................................................6
    2. PRE-DELIVERY OBLIGATIONS .............................................................................6
    3. PRODUCT WARRANTY .........................................................................................6
    4. WARRANTY AND RECALL SERVICE .....................................................................6
    5. CLAIMS ...............................................................................................................7
    6. PRODUCT MODIFICATIONS.................................................................................7
    7. SALES AND WARRANTY REGISTRATION FORM ....................................................7

G. TRAINING ....................................................................................................................8

H. CUSTOMER SATISFACTION ..........................................................................................8

I. ADVERTISING ...............................................................................................................8

    1. DEALER RESPONSIBILITIES .................................................................................8
    2. SELLER ASSISTANCE............................................................................................8
    3. DIRECT MAIL......................................................................................................9
    4. PROHIBITED PRACTICES ....................................................................................9

J. OTHER RESPONSIBILITIES............................................................................................9

    1. FINANCIAL REPORTS ..........................................................................................9
    2. STATISTICAL REPORTS........................................................................................9
    3. COMPLIANCE WITH LAWS .................................................................................9

i

    4. CAPITAL AND CREDIT REQUIREMENTS ...................................................................9
    5. INSURANCE ...............................................................................................................10
    6. INSPECTIONS ............................................................................................................10
    7. DATA TRANSMISSION SYSTEMS .............................................................................10
    8. CONFIDENTIALITY ...................................................................................................10

K.  TRADEMARKS .................................................................................................................10

    1. OWNERSHIP ..............................................................................................................10
    2. DISPLAY ....................................................................................................................11
    3. REPRESENTATION AS TO PRODUCTS ......................................................................11
    4. CONSENT TO USE SELLER'S TRADEMARKS ............................................................12
    5. ENFORCEMENT ........................................................................................................12
    6. DEALER ....................................................................................................................12
    7. DOMAIN NAMES ......................................................................................................12

L.  CHANGES IN DEALER OPERATOR OR OWNERSHIP .........................................................13

    1. APPROVAL BY SELLER ..............................................................................................13
    2. DEATH OR INCAPACITY OF DEALER OPERATOR OR OWNER ...................................13
    3. SUCCESSION PLAN ..................................................................................................14
    4. RIGHT OF FIRST REFUSAL .......................................................................................15

M.  TERMINATION .................................................................................................................15

    1. AUTOMATICALLY ON DEATH OR INCAPACITY .......................................................15
    2. BY DEALER ...............................................................................................................15
    3. BY EITHER PARTY ....................................................................................................15
    4. BY SELLER ................................................................................................................15
    5. DEALER'S FAILURE TO PERFORM SALES, SERVICE AND FACILITIES RESPONSIBILITIES .............16
    6. DEALER'S FAILURE TO PERFORM OTHER RESPONSIBILITIES .................................16
    7. RESPONSIBILITIES FOLLOWING TERMINATION .....................................................17
    8. SUBSEQUENT RELATIONS .......................................................................................17

N.  TERMINATION OF SPECIAL MARKET RIGHTS ..............................................................17

O.  DISPUTE RESOLUTION PROCESS ....................................................................................18

    1. OPTIONAL REMEDY .................................................................................................18
    2. MEDIATION .............................................................................................................18
    3. BINDING ARBITRATION ...........................................................................................18

P.  MISCELLANEOUS ............................................................................................................18

    1. NOT AGENCY ...........................................................................................................18
    2. PRODUCT AND DESIGN MATTERS ..........................................................................18
    3. DEALER RESTAURANTS ...........................................................................................19
    4. TERMINATION OF BUELL DEALER AGREEMENT .....................................................19
    5. NOTICES ...................................................................................................................19
    6. ACKNOWLEDGMENTS .............................................................................................19
    7. WAIVER ....................................................................................................................19
    8. ENTIRE CONTRACT .................................................................................................19
    9. AMENDMENT ...........................................................................................................20
    10. GOVERNING LAW ..................................................................................................20
    11. SEVERABILITY .......................................................................................................20
    12. ASSIGNABILITY .....................................................................................................20
    13. HEADINGS .............................................................................................................20
    14. PROTECTION OF CONSUMER DATA ......................................................................20

# HARLEY-DAVIDSON MOTOR COMPANY

## GENERAL CONDITIONS OF SALES AND SERVICE

## A. PURPOSES AND OBJECTIVES OF THIS CONTRACT

This Contract represents a covenant between Seller and its United States Harley-Davidson dealers to provide current and future Harley-Davidson customers with Harley-Davidson Products and a motorcycling experience that is driven by Harley-Davidson's Mission and Values:

> **Mission Statement:**
> We fulfill dreams through the experiences of motorcycling – by providing to motorcyclists and to the general public an expanding line of motorcycles, branded products and services in selected market segments.
>
> **Values:**
> - Tell the Truth
> - Be Fair
> - Keep your promises
> - Respect the individual
> - Encourage intellectual curiosity

To that end, Seller dedicates itself to the design, engineering, manufacture, marketing and supply of Harley-Davidson Products and services designed to achieve this mission. Similarly, Dealer dedicates itself to serving the Harley-Davidson customer and ensuring that Harley-Davidson Products are sold and serviced in a manner that promotes the Harley-Davidson experience while increasing customer confidence and customer satisfaction.

Dealer and Seller, as partners, will each maintain learning organizations, fully trained and with support systems necessary to maintain the finest customer service organization in the industry.

## B. SALES EFFORTS

Seller will assign Dealer a geographic area from time to time as Dealer's Territory, in which Dealer is responsible for effectively selling at retail, servicing and otherwise representing Harley-Davidson Products. It is understood and agreed that (a) Seller may modify, alter or adjust Dealer's Territory at any time, based on Seller's good faith business judgment; and (b) Dealer's Territory is non-exclusive. Without limitation, Dealer recognizes that Seller may change its Territory if the change results from the establishment of an additional Harley-Davidson dealership or the relocation of an existing dealership.

Dealer shall devote its best efforts to promote aggressively the sale at retail of Harley-Davidson Products to customers within the Territory assigned to Dealer by Seller from time to time. To accomplish this, Dealer shall develop, maintain and direct a competent sales organization for Harley-Davidson Products and shall conduct throughout each model year aggressive Harley-Davidson Product advertising and sales promotion activities, making use, to the greatest reasonable extent, of the advertising and sales promotion programs Seller may offer from time to time.

**1. MOTORCYCLE SALES.** Dealer agrees to cooperate with Seller in reviewing and planning Dealer's Harley-Davidson Motorcycle promotion and sales effort throughout each model year and further agrees to meet such Harley-Davidson Motorcycle sales objectives based upon market shares

and other relevant criteria that Seller may reasonably establish for Dealer from time to time and which take into account Harley-Davidson Motorcycle availability.

**2. MOTORCYCLE INVENTORY AND DEMONSTRATORS.** Subject to availability from Seller, Dealer shall at all times maintain an inventory of current model Harley-Davidson Motorcycles in first class operating condition of a quantity and assortment as are in accordance with such reasonable guidelines as may be established by Seller for Dealer from time to time or which are adequate to meet Dealer's proper share of current and anticipated demand for Harley-Davidson Motorcycles in the Territory. Dealer understands that Seller may adopt and utilize sales and inventory management programs to allow Dealer and Seller to forecast Dealer's expected requirements for Harley-Davidson Motorcycles so as to enable Dealer to meet anticipated customer demand. Dealer shall cooperate with Seller in the implementation and operation of such programs throughout the model year in order to maximize the effectiveness of such programs. As part of its responsibility for maintaining an adequate inventory of Harley-Davidson Motorcycles, Dealer agrees based on availability to maintain and display in first class operating condition demonstrator Harley-Davidson Motorcycles consisting of a minimum of one from each of Seller's current families. Dealer shall maintain an effective system of motorcycle inventory control that complies with the requirements established by Seller from time to time.

**3. PARTS AND ACCESSORIES AND MOTORCLOTHES PRODUCT SALES.** Dealer agrees to cooperate with Seller in reviewing and planning Dealer's Parts and Accessories and MotorClothes product promotion and sales effort throughout each model year and further agrees to meet such Parts and Accessories and MotorClothes product sales objectives as Seller may reasonably establish from time to time.

**4. PARTS AND ACCESSORIES AND MOTORCLOTHES PRODUCT INVENTORIES.** Subject to availability from Seller, Dealer shall at all times maintain an inventory of Parts and Accessories and MotorClothes product of a quantity and assortment as are in accordance with such reasonable guidelines as may be established by Seller for Dealer from time to time to meet current and anticipated customer demand in the Territory and to fulfill Dealer's obligations for performing warranty, recall and other services pursuant to this Contract. Dealer shall maintain an effective system of inventory control and Seller agrees to provide Dealer reasonable assistance at Dealer's request to establish an effective system of inventory control.

**5. POLICE SALES.** Dealer shall promote the sales of Harley-Davidson Motorcycles to law enforcement agencies and fraternal groups within the Territory. Dealer agrees to furnish Seller from time to time with a written report concerning Dealer's sales activities under this paragraph within thirty (30) days of Seller's written request. Dealer agrees based on availability to maintain a current police demonstrator Harley-Davidson Motorcycle as may be reasonably recommended by Seller.

**6. NON-RETAIL SALES.** Dealer shall not sell Harley-Davidson Products for resale to non-retail customers, except to other United States authorized Harley-Davidson dealers in accordance with Seller's written policies. Dealer shall not sell new Harley-Davidson Motorcycles through any Internet web site or otherwise in e-commerce. Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract and Dealer shall comply with all such policies and position statements.

# C. ORDERS AND TERMS OF SALE

Dealer shall submit orders for Harley-Davidson Products to Seller in such quantity and assortment as are necessary to fulfill Dealer's responsibilities under this Contract. All orders shall be submitted in such manner as required by Seller and shall be subject to written acceptance in whole or in part by Seller at Milwaukee, Wisconsin. However, Dealer understands and agrees that Seller will not accept orders from Dealer for a specific retail customer. All orders for Harley-Davidson Products and services shall be subject to and governed exclusively by this Contract and any supplemental written terms and conditions of sale published by Seller from time to time for its dealers. This Contract and any supplemental terms and conditions of sale from Seller shall be the exclusive governing document, notwithstanding any different, new or additional terms and conditions set forth in Dealer's orders or other sales proposals. Any order for Harley-Davidson Products not shipped during the month for which delivery was scheduled or acknowledged by Seller will remain in effect unless canceled by Dealer pursuant to Seller's written procedures then in effect or unless canceled or changed by Seller in whole or in part upon written notice to Dealer.

     **1. INITIAL MOTORCYCLE ORDER.** In recognition of Seller's and Dealer's need to have new model Harley-Davidson Motorcycles available for display and sale to Dealer's customers as soon as possible, Seller from time to time may enter an initial order on Dealer's behalf for any new Harley-Davidson Motorcycle models to be offered to Dealer by Seller (referred to in this Contract as an "Initial Order"). The quantity and assortment of such new Harley-Davidson Motorcycle models comprising Dealer's Initial Order shall be as determined by Seller, based upon its reasonable judgment. Nevertheless, Seller agrees to notify Dealer in writing of its Initial Order and provide Dealer a reasonable period prior to shipment to cancel motorcycle units in its Initial Order or to revise its Initial Order within Seller's guidelines. Except for its motorcycle unit cancellations, any other revisions by Dealer to its Initial Order shall be subject to Seller's written acceptance. Following the expiration of said reasonable period, Dealer's original or revised accepted Initial Order, as the case may be, will be considered firm and shipped to Dealer.

     **2. BASIC MOTORCYCLE ORDER.** To enable Seller to plan for, establish and carry out Harley-Davidson Motorcycle production schedules effectively throughout each model year, Dealer shall, upon Seller's written request and pursuant to Seller's procedures then in effect, furnish Seller at the commencement of each model year a basic order for Harley-Davidson Motorcycles (referred to in this Contract as a "Basic Order"). The Basic Order shall be based upon Dealer's best estimate, in consultation with Seller, of Dealer's entire new Harley-Davidson Motorcycle needs for said model year. Seller shall determine the monthly quantities of Harley-Davidson Motorcycles offered to Dealer in various order phases throughout the model year to be applied against the Basic Order. Dealer agrees to amend its Basic Order, in consultation with Seller, so as to make prompt and adequate provision for any new model Harley-Davidson Motorcycles which may be introduced by Seller and offered for sale to Dealer following the commencement of the model year. All Harley-Davidson Motorcycle orders whatsoever submitted in writing by Dealer to Seller shall remain in effect unless canceled or changed by Dealer in whole or in part pursuant to Seller's written cancellation or change order procedures then in effect or unless canceled or changed by Seller in whole or in part upon written notice to Dealer.

     **3. SPECIAL EQUIPMENT.** Seller is authorized to have installed on any Harley-Davidson Motorcycle ordered by Dealer any equipment or accessory required by any applicable Federal, state or local law, rule or regulation. Dealer shall be entirely responsible for any consequences imposed by law in the event Dealer removes or tampers with any such equipment or accessory.

     **4. DELIVERY AND TITLE.** It is agreed and understood that delivery of any Harley-Davidson Products shipped to Dealer shall be made to Dealer at the Harley-Davidson factory from which such Harley-Davidson Products are shipped or, if shipped from a place other than the factory, at place of shipment, and title and risk of loss to the Harley-Davidson Products shall pass to Dealer at that time. In

the event of a C.O.D. shipment, the place of delivery shall be deemed to be the factory or other place of shipment and the carrier shall be deemed to be Seller's agent only for the purpose of making collection; title and risk of loss to the Harley-Davidson Products shall be deemed to pass to Dealer at the factory or other place of shipment subject only to the lien of Seller for the purchase price and charges reserved by C.O.D. shipments.

**5. DESTINATION CHARGES AND DIVERSION.** Dealer shall be responsible for and pay any and all storage, demurrage and other charges accruing after arrival of any shipment to Dealer at its destination. In the event Seller is required to divert Harley-Davidson Products ordered by Dealer because of Dealer's failure or refusal to accept delivery of such Harley-Davidson Products, Dealer shall be responsible for and pay the entire cost and expense resulting from such diversion, including but not limited to any transportation charges to and from Dealer's place of business, unless such failure or refusal by Dealer is without the fault or negligence of Dealer.

**6. FAILURE TO DELIVER.** Seller will endeavor, to the extent practicable considering all relevant factors, to produce and deliver to Dealer Harley-Davidson Products and services that are ordered by Dealer and which orders are accepted in writing by Seller, and that are required in the fulfillment of Dealer's responsibilities under this Contract. However, Seller shall not be liable to Dealer in any respect for failure to ship or furnish or for delay in shipment or furnishing of Harley-Davidson Products and services where such failure or delay is due to (a) shortage or curtailment of materials, labor, transportation or utility services, (b) any labor or production difficulty in any of Seller's own or any of its suppliers' or subcontractors' locations, (c) any governmental action, (d) Acts of God or (e) any other cause beyond Seller's reasonable control or without Seller's direct fault or negligence. During any period of shortage of any Harley-Davidson Products or services due to any cause whatsoever, Seller shall have the exclusive right to allocate Harley-Davidson Products and services to Dealer and all other dealers and customers based upon such relevant criteria which Seller may establish in its discretion from time to time, notwithstanding anything herein to the contrary. Such criteria may include, but shall not be limited to, past sales performance by dealers, inventory levels, current and future sales potential of markets, economic forecasts, Seller's operating and strategic plans, government laws and regulations, and/or any other relevant criteria.

## D. PRICES AND PAYMENT

**1. PRICES.** All sales of Harley-Davidson Products and services by Seller to Dealer will be made in accordance with the prices, charges and discounts and other terms and conditions of sale established by Seller. Seller reserves the right at any time and from time to time to change prices, charges, discounts, allowances, rebates, refunds or other terms and conditions of sale applicable to any Harley-Davidson Products and services upon issuing to Dealer new price schedules, bulletins or other written notices. Except as otherwise provided in said written notices, such changes shall apply to all Harley-Davidson Products and services ordered by Dealer and not shipped by Seller at the time such changes are made effective by Seller. Except with respect to the pricing of new model Harley-Davidson Motorcycles at the introduction thereof, any unfilled order placed by Dealer for a Harley-Davidson Motorcycle which has been increased in price prior to notice to Dealer may be canceled by Dealer pursuant to Seller's procedures then in effect, provided written notice of cancellation is delivered to Seller within a reasonable time following Dealer's receipt of notice of price change.

**2. PAYMENT.** Payment for Harley-Davidson Products and services shall be made by Dealer either cash in advance, or as otherwise agreed to by Seller in writing from time to time.

**3. DELINQUENCY.** If Dealer is delinquent in payment of any indebtedness or obligation to Seller or any affiliate of Seller, or fails to execute and return any security documents

requested by Seller or any affiliate of Seller, or if Dealer is in default with respect to any provision of this Contract, then Seller, in its discretion and in addition to any other rights and remedies it may have under this Contract or at law, may suspend all pending orders and shipments to Dealer until said delinquency is cured or said security documents are received or until said default is cured, as the case may be.

## E. FACILITIES

Dealer agrees to maintain facilities of satisfactory condition and attractive appearance, which promote a tasteful atmosphere, are in a satisfactory location, provide sufficient space dedicated to Harley-Davidson Products, and are adequate to meet Dealer's responsibilities under this Contract for the display, sales, stocking and service of Harley-Davidson Products. Dealer acknowledges the importance of its facility and its effect on the Harley-Davidson experience and brand image and agrees to comply with all written facility guidelines established by Seller from time to time.

**1. LOCATION AND USE.** Dealer or any of the persons identified in paragraph 4 of the Signature Document of this Contract shall not, either directly or indirectly, establish any place of business for the sale or service of new or used Harley-Davidson Products or the conduct of any of Dealer's other responsibilities under this Contract at any location other than the Dealer Location, without the express prior written consent of Seller. Dealer shall not change the usage of any portion of its facilities without the prior written consent of Seller, which consent shall not be withheld unreasonably.

**2. IDENTIFICATION.** Dealer agrees to identify the operation of its independent business, including in its trade name, as Seller's authorized Dealer, all in a manner and form as may be recommended by Seller. Dealer further agrees to reasonably identify its facilities with the current approved Harley-Davidson identification. Subject to applicable laws, ordinances or regulations, Dealer shall be responsible for the installation and maintenance in a conspicuous place outside its facilities of current Harley-Davidson signage. Dealer shall also install and maintain within its facilities such signage as may be recommended to advertise properly Dealer's representation of Seller as an authorized independent dealer of Seller and on a basis mutually satisfactory to Seller and Dealer. All signs and other identification shall be compatible with the design standards established by Seller from time to time and shall be subject to Seller's written approval from time to time with respect to any display or other usage of any trademark or trade name used or claimed by Seller or any of its affiliates.

**3. HOURS OF OPERATION.** Dealer shall, subject to any applicable laws, ordinances or regulations, keep its facilities open for business during such days and hours as will most conveniently fulfill the needs of sales and service customers and based on the customary hours of similar businesses in the Territory.

**4. SELLER ASSISTANCE.** To assist Dealer in planning, establishing and maintaining adequate facilities to fulfill its responsibilities under this Contract, Seller will make available to Dealer at its written request copies of building layout plans, facility planning recommendations and the applicable identification programs covering the installation and maintenance of recommended signs. Upon Dealer's written request, Seller also will make its representatives available from time to time to counsel and advise Dealer in connection with Dealer's planning, operation, maintenance and equipping of its facilities.

## F. SERVICE

**1. SERVICE ORGANIZATION.** Dealer shall develop, maintain and operate at its facilities an effective service organization including competent service personnel in adequate numbers consistent with Seller's guidelines, essential equipment and tools, and service literature as may be determined by Seller so as to provide prompt, professional, workmanlike, courteous, and willing service to all customers requesting Harley-Davidson Motorcycle or Parts and Accessories service. Dealer shall recognize the importance of giving priority to emergency Harley-Davidson Motorcycle service work requested by customers who are touring over routine service work for its other customers, if the use of the touring customer's Harley-Davidson Motorcycle or other Harley-Davidson Products being serviced is impaired. Dealer shall perform all Harley-Davidson Product services under this Contract, including pre-delivery, warranty and recall service, as an independent contractor. All service shall be provided only by Dealer and its employees, and shall be in accordance with such standards and procedures as may be specified or recommended by Seller from time to time. Dealer agrees to post its labor rates in a conspicuous manner so that they are plainly visible to its service customers. Service provided by Dealer shall include only those services which are specifically requested by the customer or those services discussed in advance by the Dealer with the customer as being required. Dealer shall provide itemized statements to all customers for whom Dealer provides any service hereunder, and such statements shall be signed by the customer. Dealer shall assume responsibility for, and defend and hold Seller harmless from, all claims against Dealer and/or Seller caused by Dealer's negligence or acts or omissions in performing service.

**2. PRE-DELIVERY OBLIGATIONS.** Dealer agrees to uncrate, set up, inspect and test each new Harley-Davidson Motorcycle prior to delivery to Dealer's customer, in accordance with Seller's written instructions. Dealer agrees to make all necessary repairs to such Harley-Davidson Motorcycle and agrees that each Harley-Davidson Motorcycle, including any accessories or equipment added thereto and sold by Dealer, will be received directly by its customer fully set up by a qualified Dealer technician and in satisfactory, lawful and safe operating condition. The provisions of this paragraph shall not apply to Harley-Davidson Motorcycles sold by Dealer to other authorized United States Harley-Davidson dealers.

**3. PRODUCT WARRANTY.** Seller may establish from time to time, by notice to Dealer, certain written warranties to Dealer and/or to Dealer's customers applicable to Harley-Davidson Motorcycles and other Harley-Davidson Products. THERE SHALL BE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS with respect to any Harley-Davidson Products, except the written warranties as may be established by Seller pursuant to this paragraph. Dealer shall make all sales of Harley-Davidson Products covered by Seller's customer warranty in such manner that Dealer's customers shall acquire all rights accorded under Seller's customer warranty. Dealer further agrees to explain Seller's customer warranty to its customers prior to the consummation of any sale of Harley-Davidson Products and to advise its customers in writing that any extended warranty program that may be offered by Dealer is not a warranty of Seller. Dealer shall also deliver a copy of the customer warranty to its customer at the time of delivery of any Harley-Davidson Product covered by such customer warranty. Dealer shall also register with Seller all Harley-Davidson Motorcycles and any other Harley-Davidson Products sold by Dealer for purposes of establishing warranty protection, providing essential information in the event of a recall of Harley-Davidson Products, and/or providing Seller with useful market information, all in accordance with Seller's written procedures from time to time. Dealer shall maintain an effective service and warranty management system that complies with the requirements established by Seller from time to time.

**4. WARRANTY AND RECALL SERVICE.** Dealer agrees to repair and service all Harley-Davidson Motorcycles and Parts and Accessories which are covered by Seller's customer warranty in accordance with Seller's warranty manuals and written instructions from time to time. Dealer further agrees to perform such Harley-Davidson Product inspections and/or repairs as may be required by Seller,

including in furtherance of any Federal or state or local laws or regulations issued thereunder. Warranty and recall services are to be provided by Dealer regardless of the origin of purchase of such covered Harley-Davidson Products. Except as otherwise provided by Seller in writing, Dealer shall use only genuine Harley-Davidson Products in performing warranty and recall service. Dealer agrees to use its best judgment on prioritizing service work, recognizing the importance, however, of providing timely recall and warranty service to customers. At the time a Harley-Davidson Motorcycle is brought to Dealer for service, Dealer shall check the vehicle recall status of the motorcycle and take appropriate action to promptly complete any open recalls. When so requested by Seller, Dealer shall provide reasonable assistance and support to effectuate the recall of a Harley-Davidson Product. Dealer shall promptly report to Seller and seek assistance with respect to any warranty, recall or other service work which cannot be performed to the Dealer's or customer's satisfaction. Seller shall give priority to such requests of the Dealer over other service assistance. Dealer will assume responsibility for, and defend and hold Seller harmless from, all claims against Dealer and/or Seller caused by Dealer's negligence or acts or omissions in performing service.

5. **CLAIMS.** Dealer shall submit claims to Seller, in such form as may be required by Seller, for compensation for labor and parts used by Dealer in performing its warranty, recall and pre-delivery obligations for retail customers under this Contract. Seller shall provide Dealer with reasonable compensation therefor. Dealer agrees to furnish Seller with full information as to its labor rates and related information respecting service matters in such form and at such intervals as may be reasonably requested by Seller. Dealer shall maintain adequate records and documents supporting each such warranty, recall and pre-delivery claim or any other claims Dealer may make to Seller pursuant to any advertising promotion or other program of Seller. In addition to any other rights or remedies Seller may have under this Contract or at law, Seller may charge back to Dealer all payments or credits made by Seller to Dealer with respect to any warranty, recall, pre-delivery or any other claims whatsoever which were improperly claimed or paid.

6. **PRODUCT MODIFICATIONS.** Seller recognizes Dealer is an independent business and may sell motorcycle products which are not Harley-Davidson Products. To avoid disparagement of any Trademarks or Harley-Davidson Products and to avoid misleading its customers, Dealer shall, if it sells for installation or installs on any Harley-Davidson Motorcycle any item of equipment or parts or accessories that are not Harley-Davidson Products, disclose to its customer, in writing, that such item of equipment or parts or accessories has not been sold by and manufactured by or for Seller and that Seller does not assume any responsibilities therefor. Dealer agrees to indemnify, defend and hold harmless Seller and its affiliates against any and all claims, demands, suits, causes of action, damages and expenses (including reasonable attorney's fees) whatsoever arising directly or indirectly from Dealer's sale or service of non-Harley-Davidson Products, installation of non-Harley-Davidson components into Harley-Davidson Products, use of Harley-Davidson Parts and Accessories in applications not specified by Seller, or unauthorized modification of Harley-Davidson Products, all of which shall be the responsibility of Dealer.

7. **SALES AND WARRANTY REGISTRATION FORM.** Dealer shall complete and electronically file with Seller a sales and warranty registration form for every new Harley-Davidson Motorcycle sold by Dealer. Dealer must file such form with Seller within ten (10) days of the delivery of such Harley-Davidson Motorcycle to its customer to comply with the provisions of the National Traffic and Motor Vehicle Safety Act, Public Law 89-563, as amended, and to qualify the Harley-Davidson Motorcycle for coverage under Seller's customer warranty. Dealer shall maintain a hard copy of all sale documents, including a hard copy of the fully completed and signed sales and warranty registration form, in its files for a minimum of five (5) years from the date of sale.

## G. TRAINING

Dealer and Seller agree that training of all Dealer employees is critical to providing retail customers a satisfactory sales and service experience with Harley-Davidson and to the success of Dealer and Seller in conducting business under this Contract. Therefore, Dealer shall have the right to send its employees who may be eligible to attend Seller's service schools, seminars, and other training programs as may be offered by Seller. Dealer agrees that it will employ sufficient numbers of employees fully trained in sales, service and customer satisfaction, in accordance with standards established by Seller. Dealer further agrees that it shall ensure that each of its service technicians is highly qualified and knowledgeable of the Harley-Davidson Products, and, when need be, that its service technicians complete service seminars and schools and participate in service training programs that may be offered or sponsored by Seller in accordance with such standards. Dealer and Seller will cooperate to make such training available to Dealer's employees in a cost-effective manner.

## H. CUSTOMER SATISFACTION

A goal of Seller and Dealer is for the Harley-Davidson brand name to be synonymous with the highest levels of customer satisfaction in the motorcycle industry. Dealer will take all reasonable steps to ensure that all customers are completely satisfied with their Harley-Davidson Products and the services and practices of Dealer. Dealer agrees that satisfaction must occur before, at the time of, and after each sale or service to a customer, by program participation, advertising, promotion, display, demonstration, instruction, sponsorship and other involvement with Seller's Harley Owners' Group ("H.O.G.") program, other motorcycle organizations, community and such activities, and by other ways of providing personal attention from the Dealer's retail facility. Dealer will not engage in any practice or method of operation if its nature or quality may impair the reputation of Seller, the Harley-Davidson name or Harley-Davidson Products. Dealer shall evaluate adopting recommendations by Seller for improving customer satisfaction, but Dealer shall not wait for or rely only upon such recommendations because customer satisfaction always remains an independent obligation of Dealer.

## I. ADVERTISING

**1. DEALER RESPONSIBILITIES.** Dealer agrees to develop, utilize and participate in various advertising and sales promotion programs, in a manner consistent with Seller's brand identity guidelines, in fulfilling its responsibilities for selling, promoting and advertising Harley-Davidson Products in the Territory. In so doing, in the Territory Dealer agrees to: (a) maintain a display advertisement in the Yellow Pages of the principal telephone directory, in an appropriate size as determined by Dealer and in a form approved by Seller; (b) make reasonable use of newspaper, direct mail, television, radio or other appropriate advertising media; (c) participate to a reasonable and prudent extent in advertising or sales promotion programs offered from time to time by Seller and in accordance with the applicable provisions and rules thereof; (d) participate to a reasonable extent in Harley-Davidson's H.O.G. program; and (e) make every reasonable effort to build and maintain customer interest in Harley-Davidson Motorcycle activities and confidence in Dealer, Seller and Harley-Davidson Products.

**2. SELLER ASSISTANCE.** To assist Dealer in fulfilling Dealer's advertising and promotion responsibilities, Seller may develop and offer from time to time various advertising and sales promotion programs to promote the sale of Harley-Davidson Products for the mutual benefit of Seller and Dealer. Seller may also offer to Dealer from time to time advertising and sales promotion material without charge or for purchase by Dealer at Seller's discretion.

**3. DIRECT MAIL.** Dealer recognizes the usefulness and benefits of any cooperative direct mail Harley-Davidson Product advertising programs that may be offered by Seller and therefore will give its utmost consideration to participating in any such programs during the term of this Contract, subject to Seller's offering a direct mail program from time to time. The terms and conditions of Dealer's participation in any such programs shall be covered by separate written agreement between the parties.

**4. PROHIBITED PRACTICES.** In recognition of the need to maintain the highest standards of ethical advertising and business practice, neither Seller nor Dealer will publish or cause or permit to be published any representation or advertising relating to Harley-Davidson Products or their servicing which may mislead or deceive the public, impair the goodwill of Seller, the Trademarks, Dealer or the reputation of Harley-Davidson Products. Dealer shall not represent or sell any custom-built motorcycle as a Harley-Davidson Product. Dealer shall avoid in every way any deceptive, misleading, confusing, illegal or "bait" advertising or business practice. Seller agrees not to publish or employ any such advertising or practice or encourage Dealer to do so.

## J. OTHER RESPONSIBILITIES

**1. FINANCIAL REPORTS.** Dealer agrees to furnish Seller, on a monthly, quarterly or annual basis as Seller may request, signed financial reports giving Seller a complete, true and accurate report of Dealer's dealership operations for the time periods requested. Dealer's financial reports shall consist of a balance sheet and profit and loss statement, and all financial reports shall be in such form as may be reasonably required by Seller (which may include preparation and presentation in accordance with generally accepted accounting principles). Dealer shall furnish its financial reports to Seller no later than thirty (30) days following the close of each month (for monthly statements), thirty (30) days following the close of each quarter (for quarterly statements) or sixty (60) days following the close of Dealer's fiscal year (for annual statements), as the case may be. Dealer agrees also to promptly furnish Seller a copy of any adjusted financial report that may be prepared by or for Dealer. Dealer agrees to furnish all financial reports in accordance with the written guidelines established by Seller from time to time for financial reporting. All such financial information furnished by Dealer shall be handled by Seller on a confidential basis and, unless authorized by Dealer or required by law or offered in evidence in judicial or administrative proceedings, such financial information shall not be furnished to any party other than Seller, its subsidiaries, affiliates and agents.

**2. STATISTICAL REPORTS.** Dealer and Seller both recognize the importance of having access to relevant information on a timely basis in order to compete more effectively. Dealer will cooperate with Seller in furnishing inventory, retail sales and other statistical reports as may reasonably be requested by Seller from time to time.

**3. COMPLIANCE WITH LAWS.** Dealer shall at all times conduct its business in full compliance with all applicable Federal, state and local laws, rules and regulations, including but not limited to complying with state and federal unfair practice laws and delivering Harley-Davidson Motorcycles and providing all Harley-Davidson Motorcycle service and repairs in compliance with all applicable safety, emissions and noise regulations. Seller and Dealer agree to provide each other such information and assistance as may reasonably be requested by the other in connection with the performance of their respective obligations under such laws, rules and regulations.

**4. CAPITAL AND CREDIT REQUIREMENTS.** Dealer recognizes that in order to properly fulfill its responsibilities under this Contract, it is necessary for Dealer to provide and maintain at all times sufficient net working capital and floor plan credit lines, the amount of which will depend upon the size of Dealer's operations as contemplated by this Contract. Based on its reasonable guidelines,

Seller will establish for Dealer from time to time the minimum net working capital and floor plan credit line requirements for Dealer's operations, and Dealer agrees to meet said requirements.

**5. INSURANCE.** Dealer shall procure at its expense and maintain at all times customary property, theft and liability insurance insuring its facilities, fixtures, equipment, inventory of Harley-Davidson Products and all other property of Dealer, for the full value thereof. Said insurance shall name Seller as a loss payee and Dealer agrees that all proceeds of said insurance shall be used in part to pay Seller promptly all amounts owed Seller for Harley-Davidson Products and services purchased by Dealer and unpaid as of the date of loss, whether or not said unpaid amounts were then due. Dealer agrees to provide Seller with satisfactory evidence of said insurance coverage and notify Seller immediately in writing of any changes in said insurance coverage.

**6. INSPECTIONS.** Dealer shall allow persons designated by Seller, at reasonable times and intervals and during normal business hours, to examine Dealer's facilities, operations and inventory of Harley-Davidson Products at Dealer's facilities for sales, service or repair, to assist and instruct Dealer in the operation of its business, and to audit and copy or obtain originals as Seller may elect of any and all of Dealer's records and documents pertaining to its performance of this Contract. Dealer agrees that he will cause to be maintained in a readily accessible form all of said records and documents for a period of no less than five (5) years.

**7. DATA TRANSMISSION SYSTEMS.** Seller and Dealer recognize and agree that providing the highest level of service and support and achieving the other goals of this Contract involve the integration of people, technology and business systems. To promote that integration, Dealer agrees to maintain and utilize a computer system that meets the Dealer's internal business needs and permits direct communication between Dealer and Seller. Seller may establish from time to time reasonable standards and policies as it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract.

**8. CONFIDENTIALITY.** Dealer shall strictly maintain the confidentiality of all non-public information and documents provided to it by or on behalf of Seller, or to which it has access through Seller, including information and documents in any form or format now or hereafter developed regarding product development, new products, production and delivery schedules, pricing, marketing plans, methods of accessing internal information (electronically or otherwise) and other proprietary matters. Dealer shall not disclose any such information or documents to any other person, including to any competitors or customers.

## K. TRADEMARKS

**1. OWNERSHIP.** Dealer acknowledges that Seller's parent, H-D Michigan, Inc., a Michigan corporation located at 315 W. Huron, Ann Arbor, Michigan ("HDM") is the exclusive owner, and Seller is HDM's licensee, of the various trademarks, service marks and trade names, and/or word and design marks and copyrights which Seller uses in connection with Harley-Davidson Products and the servicing thereof and the service and products licensed by Seller (referred to in this Contract as "Licensed Products") or which Seller or HDM otherwise claim (referred to in this Contract as "Trademarks"). Dealer further acknowledges the great value of and goodwill associated with the Trademarks and the fact that they have acquired a secondary meaning in the minds of the public. Dealer, either during the Term of this Contract or thereafter, shall neither have nor claim any rights in respect to the Trademarks or otherwise attack the title or any rights of HDM or Seller or their parents, subsidiaries or other affiliates in and to the Trademarks. All images, graphics, trademarks, trade dress, logos, artwork, slogans, text, domain names, and other works of authorship created by or on behalf of Dealer for use in connection with Dealer's authorized dealership which directly or indirectly incorporate, refer or relate to Harley-Davidson

or Harley-Davidson Trademarks shall belong exclusively to HDM, and Dealer hereby assigns all right, title and interest in and to said works to HDM. Dealer shall execute whatever additional documents HDM or Seller deem necessary and appropriate, in their sole discretion, to vest in HDM title to said works. Dealer shall also cause any third party retained by Dealer to create, in whole or in part, any of said works to execute whatever assignments and other documents HDM or Seller, in their sole discretion, deem necessary and appropriate to vest ownership in said works in HDM and shall inform any such third party of the requirements of this paragraph prior to retaining them. Dealer shall not register or apply to register as a trademark its corporate name or any other name or mark which incorporates any of the Trademarks with any state, federal or other governmental entity.

2. **DISPLAY.** Dealer is granted the non-exclusive, non-transferable license to display the Trademarks solely in the conduct of its authorized Harley-Davidson dealership business but only in the manner approved by Seller and HDM from time to time. The right to use the Trademarks in connection with products is limited to Harley-Davidson Products purchased from Seller or licensed products purchased from an authorized licensee of Seller, and Dealer shall use the Trademarks only in connection with services which are authorized and conform to quality standards established by Seller from time to time. Such Trademarks may be used as part of the name under which Dealer's authorized Harley-Davidson dealership business is conducted only with the express written approval of Seller and HDM and within such guidelines as Seller may establish from time to time. This license or any approval previously granted by Seller and HDM shall terminate automatically upon the termination of this Contract for any reason, or may be canceled or withdrawn by Seller and HDM at any time without cause. Moreover, Dealer shall discontinue immediately the display or use of any Trademarks or change the manner in which such Trademarks are displayed or used whenever requested to do so by Seller and HDM. The Trademarks may not be used by any business owned or controlled in whole or in part by Dealer or any of its Owner(s) without Seller's and HDM's prior written consent. Dealer shall acquire no rights in the Trademarks by virtue of any such use, but such use shall inure to the benefit of Seller and HDM. Dealer shall not create nor cause to be created on its behalf any logos, slogans, artwork, designs, or marks incorporating any of the Trademarks or any stylized representations or variations thereof or to be used in connection with any of the Trademarks without the prior approval of HDM and Seller. Dealer shall not use any other name or mark in combination with any of the Trademarks without the prior written approval of Seller or HDM (which approval may be withheld by Seller or HDM in their sole discretion). Dealer shall not register as a trademark any name or mark that incorporates any of the Trademarks. This Contract does not authorize Dealer to display or in any way use, and Dealer is hereby expressly prohibited from displaying or in any way using Trademarks in connection with any restaurant or other beverage or food service operation at any location, including at the Dealer Location, except as expressly permitted in writing by Seller.

3. **REPRESENTATION AS TO PRODUCTS.** Dealer shall not sell or offer for sale as Harley-Davidson products any products which are not either Harley-Davidson Products or licensed products purchased from any authorized licensee of Seller. Dealer shall not purchase for resale or any other distribution any products bearing the Trademarks from any source other than Seller or its authorized licensees without the prior written approval of Seller or HDM. In addition, Dealer shall not create or have created on its behalf any products to be sold or otherwise distributed at Dealer's authorized Harley-Davidson dealership or elsewhere utilizing Dealer's trade name or any of the other Trademarks or any variations or stylized representations thereof. Dealer shall not alter, obscure, remove or otherwise interfere with any trademarks, trade names, word marks, design marks or other permanent markings placed on any Harley-Davidson Product by the manufacturer or otherwise under the authority of Seller or HDM. Dealer shall not place any trademarks, trade names, word marks, design marks or other permanent markings on any Harley-Davidson Product without the prior written approval of Seller or HDM (which approval may be withheld by Seller or HDM in their sole discretion). Dealer shall not engage in any conduct or take part in any activity which, with reference to the Trademarks, might tend to impair the

11

validity or enforceability of any of the Trademarks or any registrations thereof; or which might dilute the distinctive quality of the Trademarks or which might tend to disparage the Trademarks or Seller or HDM or which might be considered unfair competition or an infringement or other violation of Seller's rights; or which would be likely to cause any confusion, mistake or deception as to whether any third party is an authorized Harley-Davidson dealer or is otherwise sponsored by or affiliated with Seller or HDM if that party is not or whether any third party's products are licensed, sponsored or approved by or originate with Seller or HDM if they are or do not. Dealer shall not have any rights against Seller or HDM for damages or other remedy by reason of Seller's or HDM's alleged failure to prosecute any alleged infringements or imitations by others of the Trademarks.

       **4. CONSENT TO USE SELLER'S TRADEMARKS.** Dealer agrees that it has no right whatsoever to object to or otherwise prevent Seller's allowing any other dealer to display the Trademarks or use them as part of any business name.

       **5. ENFORCEMENT.** Dealer agrees upon notice from Seller or HDM to immediately discontinue use of and to remove from its premises all materials bearing any of the Trademarks, including without limitation any signs, labels, stationary, advertising and reading material, that Seller or HDM determine constitute an improper use of the Trademarks or reflect adversely on the reputation or brand image of HDM, Seller, or any of their affiliated companies or their businesses, products or services. Dealer agrees and undertakes fully and without reservation to render to HDM and Seller all assistance in connection with any matter pertaining to the protection, enforcement, registration or licensing of the Trademarks, whether in the courts, administrative agencies or otherwise, and to make available to Seller or its duly authorized representatives all of Dealer's records, files and other information pertaining to the purchase, preparation, manufacture, sale and/or distribution of the goods identified by the Trademarks and the rendering of services under the Trademarks as may be necessary for the purposes of attaining or assisting in said protection, enforcement, registration or licensing. Dealer agrees that it will, whenever requested by HDM or Seller, assist HDM in the registration of any service mark, trademark, or trade name heretofore or hereafter used on products sold by Dealer and manufactured or marketed by or with authorization of Seller or in connection with services rendered by Dealer. The obligations of Dealer under this Part K inure to the benefit of HDM, Seller, their successors and assigns and shall survive the termination or expiration of this Contract for any reason. If Dealer shall refuse or neglect to keep and perform its obligations under this Part K, Dealer shall reimburse Seller for all costs, reasonable attorneys' fees and other expenses incurred by Seller in connection with any action to require Dealer to comply therewith.

       **6. DEALER.** As used in this Part K with respect to restrictions on Dealer, the term "Dealer" shall also include any affiliates of or other companies owned by Dealer and all managers and/or Owner(s) of Dealer.

       **7. DOMAIN NAMES.** Subject to HDM's approval, Dealer may register domain names that conform to Dealer's trade name or dealership name. HDM reserves the right at all times, and within HDM's sole discretion, to determine whether any particular domain name (in addition to Dealer's trade name or dealership name) is suitable if Dealer's web site relates to Harley-Davidson dealership operations or displays the Trademarks. Upon written request by HDM, Dealer shall cancel or take any steps necessary to assign any domain name incorporating any Trademark to HDM. Dealer shall comply with Seller's Internet guidelines issued and in effect from time to time.

# L. CHANGES IN DEALER OPERATOR OR OWNERSHIP

1. **APPROVAL BY SELLER.** Dealer shall give Seller prior written notice and complete explanation of any proposed transfer, sale or other change in Ownership, Dealer Operator or business structure of Dealer, no matter what the share or relationship between the parties, and immediate notice of the death or incapacity of the Dealer Operator or any Owner(s). No such notice or change may be made or shall be effective against Seller unless and until Seller gives its prior written approval, which Seller shall not unreasonably refuse, and the change is set forth in a new dealer contract or a written amendment to this Contract duly executed by Seller and Dealer. Dealer agrees that factors which would make Seller's refusal to give its approval reasonable include, without limitation, the unwillingness of the proposed owner or dealer operator to accept and comply with Seller's dealer contract, or the failure of a proposed owner or dealer operator to meet Seller's standards for capital or financial capability, personal qualifications, business experience, or demonstrated commitment to the full time on-site management of Dealer's operations. Notwithstanding the foregoing, if the proposed successor owner is the spouse or child of such person, Seller agrees to waive its personal qualifications standard (except as to any matter described in subparagraph M.6(a) of these General Conditions). Additionally, Seller is not obligated to approve a proposed change, execute an amendment to this Contract or enter into a new dealer Contract unless Dealer makes arrangements acceptable to Seller to satisfy any indebtedness to Seller. Except for Seller or Harley-Davidson, no publicly-owned corporation may, directly or indirectly, in whole or in part, own and/or operate any Harley-Davidson dealership, unless otherwise permitted by Seller's policy on public ownership. Additionally, no person or entity may, directly or indirectly, in whole or in part, own and/or operate a number of Harley-Davidson dealerships in excess of the number permitted by Seller's policy on multiple ownership. Dealer agrees that it would be reasonable for Seller to refuse to give its approval to a proposed transfer, sale or other change in ownership or dealer operator if such transfer, sale or other change would result in the direct or indirect public ownership or operation of any Harley-Davidson dealership or if it would result in any person or entity, directly or indirectly, in whole or in part, owning and/or operating a number of Harley-Davidson dealerships in excess of the number permitted under Seller's policy on multiple ownership. Seller may establish and amend from time to time such policies on public ownership and multiple ownership as it believes are necessary or advisable to carry out the purpose or intent of this paragraph.

2. **DEATH OR INCAPACITY OF DEALER OPERATOR OR OWNER.**

   **(a) INCAPACITY.** As used in this Contract, "incapacity" shall refer to any physical or mental ailment of Dealer Operator or any Owner(s) that adversely affects Dealer's ability to meet its obligations under this Contract.

   **(b) TERMINATION.** This Contract shall automatically terminate effective ninety (90) days after the death or incapacity of Dealer Operator or any Owner(s), provided that Dealer may request an extension of the effective date of expiration to assist Dealer in winding up its dealership business or to provide for a transfer of assets or Ownership previously approved under this Contract. The request must be made, however, at least thirty (30) days prior to the effective date of termination, in which event Seller will not unreasonably refuse to grant such an extension. Dealer agrees that factors which would make Seller's refusal to grant such an extension reasonable include, without limitation, an unreasonably long period of deferral, a dispute regarding entitlement to Dealer assets or a deceased or incapacitated Owner(s)' interests, inadequate consumer sales, service or satisfaction in the Territory, or impairment of the Harley-Davidson name or the Trademarks.

   **(c) SUCCESSOR NOMINATION.** Dealer may apply for a Successor Nomination designating a proposed dealer operator and/or owner(s) of a successor dealer to be established under a new dealer contract, in order to continue the operations identified in this Contract after it terminates because of death or incapacity. Seller will execute the Successor Nomination if the

proposed dealer operator or owner(s) meet Seller's standards for approving changes in such regards. If the proposed dealer operator or owner(s) is the spouse or child of the Dealer Operator or any Owner(s) and provided the matters described in subparagraph M.6.(a) of these General Conditions would not be applicable to him or her, Seller shall execute the Successor Nomination if the spouse or child meets or agrees to meet Seller's requirements relating to business experience and demonstrated commitment to the full time on-site management of Dealer's operations. However, the proposed dealer operator or owner(s) will not be required to meet usual capital or financial capability requirements until after the Successor Nomination is implemented by death or incapacity, in which event the proposed person(s) will provide Seller within thirty (30) days prior to the termination of this Contract, including any deferrals, such information as Seller requires.

**(d) NEW SUCCESSOR NOMINATION.** Dealer may cancel an executed Successor Nomination at any time prior to the death or incapacity of the Dealer Operator or Owner(s). Seller may cancel an executed Successor Nomination only if the proposed dealer operator or owner(s) no longer meet the Seller's standards. The parties may execute a superseding Successor Nomination by agreement. A Successor Nomination shall expire automatically upon expiration of the term of this Contract.

**(e) INDEPENDENT ACTION REQUIRED BY DEALER.** Dealer acknowledges that Owner(s) have the independent responsibility to take whatever actions are necessary to create the right in the proposed owner(s) to any transfer of Ownership approved by the Seller under the Successor Nomination.

**(f) RIGHTS OF REMAINING OWNER(S).** If the Dealer Operator or any Owner(s) dies or is incapacitated and Dealer and Seller have not executed a Successor Nomination in that regard, any remaining Owner(s) and/or the legal representative of a deceased or incapacitated Owner(s) may propose a dealer operator and/or owner(s) of a successor dealer to be established under a new dealer contract, in order to continue the operations identified in this Contract after it terminates because of death or incapacity. The proposal, including all applications and information reasonably requested by Seller to reach its decision, must be made in writing to Seller at least thirty (30) days prior to the termination of this Contract, including any deferrals. Seller will accept a proposal, provided that (a) the proposed successor dealer's owner(s) and dealer operator meet Seller's standards and are ready, willing and able to comply with the requirements of a new dealer contract; and (b) all outstanding monetary obligations of Dealer to Seller have been paid.

**(g) LIMITATION ON OFFERS.** Within sixty (60) days after receiving the required information, Seller will notify Dealer in writing of its decision regarding, as applicable, (a) the capital or financial capability requirements of a person previously approved under a Successor Nomination, or (b) a proposal submitted as required where no Successor Nomination was executed. Seller's offer of a new dealer contract under such circumstances will automatically expire if not accepted by the proposed successor dealer within sixty (60) days after it receives the offer.

**3. SUCCESSION PLAN.** To enable Seller to maintain the high quality of its dealer network and to make plans for serving the future needs of customers in the Territory, Dealer shall have the right to furnish Seller with (a) an application for a Successor Nomination in the event of death or incapacity of Dealer Operator or any Owner(s), and/or (b) a written plan detailing such person's plans for eventual retirement and the proposed succession to such person's interest. All such plans shall be subject to Seller's approval as provided above.

**4. RIGHT OF FIRST REFUSAL.** When Dealer submits to Seller a proposal pursuant to paragraph L.1 to sell or otherwise transfer a majority of Dealer's assets or Ownership, Seller has a right

of first refusal enabling Seller to assume the buyer's rights and obligations under any such proposal and/or buy/sell agreement, to purchase the dealership assets, stock or other form of Ownership interest, including any leasehold interest or realty, and to cancel this Contract and all rights granted Dealer, excepting only a proposal to transfer to a person approved by Seller under an effective Successor Nomination or other plan pursuant to the preceding paragraph L.3. Seller's exercise of its right of first refusal is not dependent upon whether the proposed buyer is qualified to be a dealer operator or owner, does not require Seller's prior refusal to approve the proposed change, and supersedes any right to sell, transfer or change its interest in, or Ownership of, the Dealer. Seller may exercise its right within thirty (30) days after Seller's receipt of all data and documentation required by it to evaluate the proposed sale, transfer or other change in Ownership, which Dealer agrees promptly to provide, including but not limited to information reflecting other agreements or understandings between the parties to the buy/sell agreement. Seller's right may be assigned by it to any third party and Seller hereby guarantees the full payment to Dealer and/or Owner(s) of the purchase price by such assignee. Seller may disclose the terms of any pending buy/sell agreement and any other relevant Dealer performance information to any potential assignee. Seller's rights in this regard are binding on and enforceable against any assignee or successor in interest of Dealer or purchaser of Dealer's assets not previously approved by Seller as provided in this Part L.

## M. TERMINATION

**1. AUTOMATICALLY ON DEATH OR INCAPACITY.** This Contract shall automatically terminate prior to its expiration as provided in Part L of these General Conditions effective ninety (90) days after the death or incapacity of Dealer Operator or any Owner(s), unless extended by Seller as provided under that Part.

**2. BY DEALER.** This Contract may be terminated by Dealer prior to its expiration and without cause by providing no less than thirty (30) days prior written notice via certified mail to Seller, attention: Vice President-Sales.

**3. BY EITHER PARTY.** This Contract may be terminated by either party prior to its expiration by providing no less than fifteen (15) days prior written notice to the other:

(a) Upon the institution of voluntary or involuntary bankruptcy proceedings by or against the other party, or if the other party shall make an assignment for the benefit of creditors, a Receiver or Trustee be appointed, become insolvent or dissolution of the other party.

(b) If the other party shall fail to perform its financial obligations to the other party, or a subsidiary or affiliate of the other party, following written demand.

(c) If the other party requires a license, permit or other authorization for the performance of any responsibility under this Contract in any jurisdiction where this Contract is to be performed and said party shall fail to secure and maintain such authorization, or if such authorization is suspended or revoked, irrespective of the cause or reason, subject to a thirty (30) day right to cure by Dealer or Seller, as the case may be.

**4. BY SELLER.** This Contract may be terminated by Seller prior to its expiration by providing no less than thirty (30) days prior written notice to Dealer:

(a) For any transfer or attempt to transfer by Dealer of any interest in, or right, privilege or obligation under this Contract, or transfer by operation of law or otherwise, of any of the principal assets of Dealer that are required for the conduct of its business; or any removal or other change, however accomplished, directly or indirectly, of the Dealer Operator or in the Ownership of Dealer

approved under this Contract without first notifying Seller and obtaining its prior written consent, or without affording Seller a reasonable opportunity to exercise its right of first refusal, as required by this Contract.

      (b) If Dealer submits to Seller any application, claim, report, record or other information which is fraudulent or contains any material misrepresentation by Dealer, or if Dealer, after written warning from Seller, shall have engaged in any advertising or business practice contrary to the provisions of paragraph I.4 or J.3 of these General Conditions.

      (c) If Dealer shall fail for any reason to function in the ordinary course of business, maintain its dealership facilities open for business as provided in paragraph E.3 of these General Conditions or if Dealer shall otherwise abandon its Harley-Davidson dealership operations.

## 5. DEALER'S FAILURE TO PERFORM SALES, SERVICE AND FACILITIES RESPONSIBILITIES.

Except as otherwise provided herein, this Contract may be terminated by Seller prior to its expiration if Dealer shall fail to fulfill any of its sales, service or facilities responsibilities under this Contract. Seller shall advise Dealer in writing of such failures and will offer to review promptly with Dealer the reasons which, in Seller's opinion, or in Dealer's opinion account for such failure or failures and will provide Dealer with a reasonable opportunity to cure the same. Seller may terminate this Contract upon no less than ninety (90) days prior written notice to Dealer in the event Dealer fails or refuses to cure the same within the reasonable time allowed after the initial letter of Seller required in this paragraph.

## 6. DEALER'S FAILURE TO PERFORM OTHER RESPONSIBILITIES.

The following conduct entitles Seller to terminate this Contract prior to its expiration by providing no less than sixty (60) days prior written notice to Dealer:

      (a) Any (i) conviction of, or any plea of no contest by, Dealer, the Dealer Operator or any Owner(s) in a court of original jurisdiction with respect to any crime, or (ii) civil or administrative liability found against Dealer, the Dealer Operator or any Owner(s) for any motor vehicle-related matter other than minor traffic offenses, either of which tends to affect adversely the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller, or to impair the goodwill associated with the Trademarks.

      (b) Any dispute, disagreement or controversy among managers, officers, directors or Owner(s) of Dealer that, in the reasonable opinion of Seller, adversely affects the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller.

      (c) Seller reasonably believes that the Dealer, Dealer Operator or any Owner(s) has failed, refused or neglected to conform his or her conduct (whether personal or business) with Seller's Mission, standards of good citizenship or generally acceptable behavior in contemporary society or the local community, in a way that may adversely affect the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller, or may impair the goodwill associated with the Trademarks.

      (d) Failure to replace, within one hundred twenty (120) days after written notice from Seller, a Dealer Operator approved under this Contract who, in Seller's reasonable opinion, no longer possesses the requisite qualifications for the position or has acted in a manner contrary to the continued best interests of both Dealer and Seller.

(e) Impairment of the reputation or financial standing of Dealer subsequent to the execution of this Contract.

(f) Breach, violation or failure to fulfill any of Dealer's other responsibilities under this Contract.

**7. RESPONSIBILITIES FOLLOWING TERMINATION.** On termination or expiration of this Contract for any reason and if a new Contract is not entered into by mutual agreement of the parties:

(a) Dealer agrees to pay forthwith to Seller all sums due for Harley-Davidson Products purchased or services rendered.

(b) Dealer agrees to cease using the Trademarks in any manner and to cease in any manner, including but not limited to in a corporate name, telephone directory or outdoor sign, any advertising or representation, express or implied, to the public that Dealer is authorized to purchase Harley-Davidson Products from Seller for resale or that Dealer is authorized by Seller to provide service to Seller's products. Dealer shall immediately deliver to Seller all signs, banners, point of purchase displays and the like bearing any of the Trademarks. Any domain name used by Dealer which incorporates any of the Trademarks shall be automatically assigned to HDM, and Dealer shall not contest this assignment or thereafter use any such domain name. If Dealer shall refuse or neglect to keep and perform this provision, Dealer shall reimburse HDM for all costs, reasonable attorney's fees and other expenses incurred by HDM in connection with any action to require Dealer to comply therewith.

(c) Dealer agrees all unfilled orders for Harley-Davidson Products and services previously accepted by Seller are canceled forthwith and Seller will remit to Dealer in a reasonable time any net balance due Dealer.

(d) Dealer agrees to return or destroy all confidential information provided to Dealer by Seller and all customer information collected or obtained by Dealer while it was an authorized Harley-Davidson dealership, except for such information as Dealer is required by law to retain. Dealer's obligations under Part J.8 of this Contract shall survive the termination or expiration of this Contract.

**8. SUBSEQUENT RELATIONS.** In the event that following the termination or expiration of this Contract either party has any business dealings with the other party with respect to Harley-Davidson Products or service, such dealings shall not constitute either a renewal of this Contract or a waiver of such termination or expiration. However, all such dealings shall be governed by terms identical with the provisions of this Contract for the duration of such dealings unless the parties execute a new and different agreement with respect to such dealings.

# N. TERMINATION OF SPECIAL MARKET RIGHTS

In the event Dealer earns Special Market Rights described in paragraph 6 of the Signature Document but Dealer's performance subsequently fails to meet the Special Market Rights Performance Criteria, Dealer's Special Market Rights shall not terminate unless and until Dealer receives written notice from Seller of such failure, and Dealer thereafter fails to meet the Special Market Rights Performance Criteria within the period prescribed by Seller. In the event Dealer earns Special Market Rights but subsequently breaches or is discovered to have breached any terms and conditions of this Contract, Dealer's Special Market Rights shall terminate upon written notice to Dealer of such breaches from Seller.

## O. DISPUTE RESOLUTION PROCESS

**1. OPTIONAL REMEDY.** Seller and Dealer believe that their mutual commitment to the Mission and Values should minimize the potential for disputes between them. Nevertheless, disputes may occur which cannot be resolved in the normal course of business.

Seller and Dealer acknowledge that, at the state and federal levels, various courts and agencies may be available to them to resolve claims or controversies which might arise between them. Consistent with the provisions of the United States Arbitration Act (9 U.S.C. Section 1 et seq.), Dealer and Seller agree that the Dispute Resolution Process outlined in this Part O, which includes binding arbitration, shall be an optional mechanism for resolving any controversy or claim between them arising out of or relating to this Contract, its creation or termination. Participation in the Dispute Resolution Process is strictly voluntary. Dealer and Seller must both agree to use this Dispute Resolution Process to resolve a specific controversy or claim in order for this Part O to apply.

There are two steps in the Dispute Resolution Process: Mediation and Binding Arbitration. Any claim or controversy that both Dealer and Seller agree to resolve through the Dispute Resolution Process must first be submitted to Mediation, unless that step is waived by written agreement of the parties. If Mediation does not resolve the dispute to their mutual satisfaction, then Dealer or Seller may agree to submit the dispute to Binding Arbitration.

**2. MEDIATION.** Dealer or Seller may submit to Mediation a claim or controversy between them which arises out of or relates to the Dealer Contract. Mediation is conducted by a neutral mediator selected by the parties from a list of alternates.

Seller and Dealer agree that the procedures contained in the Harley-Davidson Alternative Dispute Resolution Guide govern Mediation under this Part.

**3. BINDING ARBITRATION.** If a claim or controversy arising out of or relating to this Contract has not been resolved after Mediation, or if Dealer and Seller have agreed in writing to waive Mediation, the claim or controversy may be settled by Binding Arbitration in accordance with the procedures in the Harley-Davidson Alternative Dispute Resolution Guide. All awards of the arbitration are binding and non-appealable except as otherwise provided in the United States Arbitration Act. Judgment upon any award rendered by the arbitrator(s) may be entered and enforced in any court having jurisdiction.

## P. MISCELLANEOUS

**1. NOT AGENCY.** It is mutually agreed that Dealer is not an agent or employee of Seller and Dealer agrees not to make any representations to others in which said relationship may be presumed or to attempt to assume or create any obligations on behalf of Seller, except with Seller's express prior written consent.

**2. PRODUCT AND DESIGN MATTERS.** Seller reserves the right to revise the Products Addendum to this Contract, including the right to add, discontinue or withdraw, as to all authorized United States Harley-Davidson dealers, any Harley-Davidson Products at any time without liability to Dealer and to make any changes in design or add improvements on any Harley-Davidson Products without incurring any obligation to install same on Harley-Davidson Products previously purchased. Furthermore, Seller reserves the right to offer any new, different or differently designated motorcycle, motor vehicle, parts and accessories therefor (including replacement parts, mechanical accessories, tools, lubricants, equipment and other supplies for the operation of motorcycles), clothing and/or any other product bearing any Trademarks or brand names used or claimed by Seller or any of its affiliates, including the name "Harley-Davidson," to select authorized Harley-Davidson dealers other than Dealer, or to others, under existing or separate new agreements. Nothing contained herein shall be

construed to limit Seller's right to test market selected products with Dealers in certain markets for limited periods of time.

**3. DEALER RESTAURANTS.** Dealer shall not own or operate, in whole or in part, directly or indirectly, any restaurant or other beverage or food service operation ("Restaurant") at, or in close proximity to, the Dealer Location, or any approved alternate or secondary retail outlet, without the prior written consent of Seller. Nothing in this paragraph is intended to prohibit the Dealer from owning or operating, in whole or in part, directly or indirectly, any Restaurant provided that such Restaurant is not at or in close proximity to the Dealer Location and does not have a motorcycle theme or use or display the Trademarks. Seller may establish from time to time such guidelines or license agreements it believes are necessary or advisable to carry out the purpose or intent of this paragraph.

**4. TERMINATION OF BUELL DEALER AGREEMENT.** If Dealer has entered into a dealer agreement with Buell Distribution Company, LLC ("Buell Agreement"), Dealer hereby agrees that the Buell Agreement shall, at the option of Buell Distribution Company, LLC, terminate automatically and without further notice upon termination of this Contract for any reason.

**5. NOTICES.** Any notice required or permitted by this Contract or given in connection therewith shall, except as otherwise provided in this Contract, be in writing and shall be given by personal delivery, first class mail with postage prepaid, or overnight courier. Notices to Dealer shall be directed to Dealer at its current place of business; notices to Seller shall be directed to Seller at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208, or such other address as Seller shall direct from time to time.

**6. ACKNOWLEDGMENTS.** Dealer acknowledges that each of its responsibilities under this Contract is reasonable, proper and fundamental to the purpose of this Contract and that its failure to fulfill any of them would constitute a material breach. Dealer also acknowledges that any such failure, occurrence, event or default would constitute a reasonable, fair, good, due and just cause and provocation for termination or non-renewal of this Contract by Seller. The term "partners" as used in this Contract shall not constitute the establishment of a legal partnership or give rise to fiduciary duties by either party to the other. Dealer further acknowledges that no direct or indirect franchise fee or required payment has been paid by Dealer to Seller in connection with this Contract, including the "franchise" and related rights thereunder. Dealer further acknowledges that it is not intended to be, and that under no circumstances shall it be deemed to be, a third party beneficiary of any of the terms or provisions of any contract Seller may enter into with any other dealer.

**7. WAIVER.** The failure of either party to enforce at any time any of the provisions of this Contract, or to exercise any option which is herein provided or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a waiver of such provisions, nor in any way to affect the validity of this Contract or any part thereof, or the right of the party to thereafter enforce each and every such provision.

**8. ENTIRE CONTRACT.** Except as explicitly agreed in this Contract, Seller has made no promises to Dealer, Dealer Operator or Owner(s) and there are no other agreements or understandings, either written or oral, between the parties affecting this Contract or relating to any of the subject matters covered by this Contract. Except as otherwise provided herein, this Contract supersedes and cancels all previous agreements between the parties that relate to any matters covered herein. No modifications, amendments or changes to this Contract, except as otherwise provided herein, shall be valid and binding unless made in writing and signed by both parties, it being agreed that this Contract and/or any modifications, amendments or changes thereto shall not be valid or binding against Seller unless signed by a Vice President or a Director of Field Sales or Operations of Seller.

**9. AMENDMENT.** Notwithstanding anything in this Contract to the contrary, Seller shall have the right, provided it exercises such right in good faith, to unilaterally amend, modify or change this Contract in case of legislation, government regulation or changes in circumstances beyond the control of Seller that might affect materially the relationship between Seller and Dealer.

**10. GOVERNING LAW.** This Contract has been signed by Dealer and sent to Seller in Milwaukee, Wisconsin for final approval and execution and there has been signed and delivered on behalf of Seller. The parties intend this Contract to be executed as a Wisconsin agreement and to be construed in accordance with the laws of the State of Wisconsin, with the exception of Chapter 218 Wis. Stats. and any amendments or successor provisions thereto unless Dealer is a licensed motor vehicle dealer situated in the State of Wisconsin. Any applicable state motor vehicle statute governing the relationship between Dealer and Seller shall be controlling in the event of a conflict between any provision of this Contract and that state statute.

**11. SEVERABILITY.** If any provision of this Contract should be held invalid and unenforceable for any reason whatsoever or to violate any law of the United States, the District of Columbia or any state or territory, such provisions shall be deemed deleted from this Contract in such jurisdiction, and the remainder of this Contract shall be valid and enforceable without such provision.

**12. ASSIGNABILITY.** This Contract and/or the rights and duties hereunder cannot be assigned by Dealer in whole or in part without the prior written consent of Seller. This Contract and/or the rights and duties hereunder may be assigned in whole or in part by Seller at any time. This Contract is binding upon the heirs, successors and assigns of the parties hereto.

**13. HEADINGS.** Paragraph and other headings are for convenience of reference only and shall not constitute a part of or otherwise affect the interpretation of this Contract.

## 14. PROTECTION OF CONSUMER DATA.

**(a) CONSUMER INFORMATION RECEIVED FROM SELLER.** Seller may provide to Dealer individual consumer information, including names and addresses of consumers who have obtained Seller's products or services. Dealer agrees not to use or disclose any such consumer information obtained from Seller for any purpose other than to carry out its obligations under this Agreement. Dealer agrees that it shall maintain the security and confidentiality of all such consumer information. Dealer also agrees that all consumer information obtained from Seller is exclusive property of Seller. Upon the termination or expiration of this Agreement, Dealer shall promptly destroy all copies of such consumer information and cease using it for any purpose. Seller may establish policies from time to time to carry out the purposes and intent of this provision.

**(b) OTHER CONSUMER INFORMATION.** In order to ensure Dealer's compliance with law, Seller may establish policies from time to time regarding the collection, use, transfer, and disclosure of individual consumer information that is collected by Dealer or that Dealer receives from sources other than Seller. Dealer agrees to fully comply with any such policies.